Jennifer V. Caughey, Justice
A jury convicted Raul Rodriguez of murder and sentenced him to life in prison, rejecting his claim that he shot his neighbor, Kelly Danaher, in self-defense.[1] In six issues, Rodriguez contends that (1) insufficient evidence supports his conviction, (2) the trial court erred by including a provocation instruction in the guilt-innocence jury charge and by denying his request for a sudden passion instruction in the punishment jury charge, and (3) the trial court erred by admitting testimony from his ex-wife during the guilt-innocence phase and evidence regarding various extraneous offenses during the punishment phase.
We affirm.
*850 Background
In the early morning of May 2, 2010, Harris County police responded to reports of a weapons disturbance in a rural neighborhood. Upon arriving at the scene, they discovered that Kelly Danaher had been shot. Two men were struggling to hold down Rodriguez, who had fired the shots. Everyone other than Rodriguez had been at a party inside. Danaher, the host of the party, died at the scene.
Rodriguez contended that he fired his gun in self-defense. After a seven-day trial, the jury rejected that defense.
Evidence During the Guilt-Innocence Phase
At trial, the jury observed an audio and video recording of the incident. Rodriguez himself recorded the scene as it unfolded. The jury also heard the testimony of numerous witnesses.
The recording
Much of the video recording consists of Rodriguez filming the party from across the street, where he was standing at the side of the road, commenting on the noise level, and shining a flashlight in the direction of the party.
About fifteen minutes into the recording, James Storm, Danaher's father-in-law, approached Rodriguez in a truck. Storm and Rodriguez argued about the noise level and Rodriguez revealed that he was a neighbor. Eventually, Rodriguez-frustrated that Storm did not think the music was a problem-told Storm, "Oh just, just hush. I don't want to talk to you," to which Storm responded that Rodriguez should go home.
This last exchange occurred as a few partygoers, including Danaher, approached. Rodriguez refused to leave. As Danaher approached, Rodriguez said, "You need to stop right there. Don't come any closer, please." Danaher continued walking towards Rodriguez and responded, "I, you're telling me what to do?" Storm added, "Don't tell us to stop coming close to you."
With Danaher still approaching, and two other partygoers now nearby, Rodriguez said, "I'm telling you, I'm telling you to stop. I said stop right now, or I will shoot you! Stop! Get back!" A partygoer yelled, "Back up Kelly" and Rodriguez repeated, "Get back!" Danaher can be seen backing away from Rodriguez with his hands up, saying "I ain't got nothing." Rodriguez responded, "Y'all are drunk. Get away from me."
Danaher moved across the street from Rodriguez, where other partygoers had gathered. He then asked Rodriguez, "You pulled a gun on me?" Rodriguez acknowledged that he had, adding "I told you to stop." Then, from opposite sides of the road, Danaher and Rodriguez continued arguing about why Rodriguez drew the gun, while Storm told the partygoers to call the police:
Danaher: I haven't done nothing to you.
Rodriguez: My life is in danger. You got weapons on you.
Danaher: Your life's in danger?
Rodriguez: Stay away from me. You're over here cussing at me and hollering.
...
Rodriguez: Get away from me. Keep it down. I got everything videotaped.
Storm: Yeah, call the cops on this jack-off. He's down here out in the middle of the street with a gun.
Rodriguez: Yeah, I told you to stop. I asked you to stop.
Danaher: And what happened? I stopped.
Rodriguez: No, you stopped after I drew my weapon.
Danaher: And I pulled back.
*851 Rodriguez: You stopped after I drew my weapon. I asked you to stop and get back.... I asked you to turn this crap down.
Storm: There's an idiot out here in the middle of the street with a gun.
Rodriguez and Danaher continued arguing from opposite sides of the road about the volume of the music, and Rodriguez called the police, to whom he admitted having drawn his gun and asserted that he was in fear for his life:
Yes, my name is Raul Rodriguez. I called again. I had to draw my weapon on somebody because I had, I told them to stop. They were drunk, they coming at me. I told them to stop. They kept coming and I drew my weapon. Then they stopped, I put my weapon up but now they're saying I'm sitting there waving my gun and everything and I'm not. I'm videotaping everything right now....
You know, it's just me against everybody. I've got, I've got ... Ah look, there's about 15 people here. Look, I'm in fear for my life right now. I'm in very ... That's why I drew my weapon. I'm in fear for my life. Please help me now.... They're going to kill me.
Storm then engaged in another exchange with Rodriguez. Storm said that Rodriguez would go to jail for drawing his gun, and Rodriguez again asserted "well, I was in fear for my life." Storm challenged Rodriguez to a fist fight, saying, "You drop the gun and let's go ahead and duke it out mother f* * *er." As the exchange continued, Rodriguez, still on the phone, told the dispatcher, "Listen. Now they're wanting to kick my ass. And now they're calling me mother f* * *er and they want to kick my ass and all this other stuff."
The video depicts another partygoer starting to cross the street toward Rodriguez. Danaher stopped him, saying, "Hey, hey, hey, Ricky.... No, no, no, no. This dude is a f* * *ing idiot, he will shoot you.... He's the idiot."
Meanwhile, Rodriguez continued talking to the dispatcher:
I've got about 15 people here, they're wanting to kick my ass. They want to beat me down. I had to draw my weapon to stop them to keep them from coming to me. I felt my life was in danger, I drew my weapon and then they stopped. I told them to get back. I told them to just to turn it down and then, they started cussing, saying we're going to kick his you know, f'ing ass and all this other stuff, calling all kinds of names and everything cuz I'm, and I says look, I'm videotaping all this right now.... And I mean, I'm scared to death here.
Storm told Rodriguez, "I tell you what pal, you pulled a gun on the wrong mother f* * *er, ok? ... You remember that," to which Rodriguez responded, "Well, y'all just need to keep it down." Storm again told Rodriguez that he should leave. Storm then drove his truck up the driveway toward the house.
Danaher continued arguing with Rodriguez: "You're gonna flash your God damn gun. You're gonna flash your gun?" Danaher again began walking toward Rodriguez, but was stopped by Wilcox, who held him back, saying, "No, no, no."
Rodriguez told the dispatcher, "Ok. They're going to escalate this.... They're going to the house to get something to shoot me with." As Storm drove toward the house, Rodriguez said, "Ok look, I'm going to defend myself.... I have to defend myself. I'm gonna have to defend myself." After hearing a bang from up the driveway, Rodriguez exclaimed, "Oh s* *t."
The video recording became dark, but a partygoer can be heard yelling, "Don't even do it. Brandon, Brandon, don't do it." Another voice said, "This is bulls* *t. You *852 don't pull a gun on me." Rodriguez then told the dispatcher:
It's about to get out of hand, sir. Please help me. Please help me sir. My life is in danger now. He's about to, he says he's about to go in the house, he's gonna be more than equal than me. Now I'm standing my ground here. Now these people are gonna try and kill me.
Toward the end of the recording, the partygoers continued arguing with Rodriguez. Danaher again asked, "You pull a f* * *ing gun on me at my house?" Wilcox then interjected, saying, "You got a gun in your f* * *ing ... you got a gun? ... What are you, hopped up on coke?" Danaher warned Wilcox, "No, no, no, he's videoing us," and Wilcox responded, "I know he is." Danaher said, "Mother f* * *er pulled a gun on me."
In the final moments of the recording, Rodriguez told the dispatcher, "Look, I'm not losing to these people any more. I'm just gonna just tell them to stay back. They're drunk. They're swearing." Then a partygoer, later identified as Ricky Johnson, moved toward Rodriguez and yelled, "Ha ha ha!" Rodriguez dropped the camera, fired his gun and yelled, "God dang it!"
Testimony of partygoers
Six partygoers testified at trial. In general, they testified that as the party was winding down, a few of them noticed a flashlight on the road and walked to the end of the driveway, where they discovered Storm and Rodriguez arguing. Only a few partygoers were present when Rodriguez first drew, then put away, his handgun, but multiple partygoers had arrived by the time Rodriguez fired. The partygoers acknowledged that Johnson had stepped into the road, waved his arms, and laughed loudly in the seconds before Rodriguez fired. But they maintained that no one threatened Rodriguez or intended to harm him.
James Tyler
Tyler, Danaher's best friend, testified to the following. Danaher stepped into the road to talk to Rodriguez, and Rodriguez drew his gun on Danaher while Danaher was about 15 feet away. Although Rodriguez made statements like, "My life is in danger," no one was being aggressive towards him, talking about weapons, or planning to attack him.
Right before the shooting, Johnson stepped into the road with his hands in the air. Tyler was standing behind Danaher and tried to pull Danaher back, but Danaher had already been shot. Tyler helped Danaher crawl back to his side of the street, and he was holding Danaher's hand and helping the Storms perform CPR when Danaher died.
Marshall Stetson
Stetson, who is Danaher's wife's cousin, testified that he was standing on the porch listening to the karaoke when he and some other partygoers noticed a flashlight shining at them from the street. He and Danaher decided to walk down to the road to investigate. According to Stetson, when they walked into the road, Rodriguez pulled his gun on them almost immediately, and Stetson thought he was going to shoot them. Both he and Danaher backed away. Stetson called 911 to report Rodriguez. He did not understand why Rodriguez kept saying he was in fear for his life.
Stetson was standing right behind Johnson when Rodriguez fired. Stetson did not hear Johnson laugh, but he saw Johnson take two steps before Rodriguez fired his first shot. Johnson was hit; he stumbled across the road and fell down. Stetson saw Rodriguez follow Johnson with his gun, so Stetson ran towards Rodriguez and tried to kick the gun out of his hand. Stetson was shot while he and Rodriguez struggled *853 for the gun. Eventually, Wilcox and Storm helped him disarm Rodriguez.
James Storm
Storm, Danaher's father-in-law, testified that around midnight, he was moving his truck from one side of the house to the other. As he was driving down the road in front of the house, he saw someone standing in the road with a flashlight and a video camera. Storm stopped to find out what the man was doing. As Storm and the man were exchanging words, Danaher and a few other men walked up. When Danaher walked towards Rodriguez, Rodriguez pulled a gun on him, even though Danaher was not threatening or aggressive.
Storm eventually drove up the driveway because he believed everyone was going to let the police handle the situation. When he was walking up the porch steps, he heard three gunshots, turned, and ran back towards the road. Storm first tried to help Danaher, then ran to help Wilcox, who was yelling for help because Rodriguez was still trying to pull the trigger. After they got the gun away from Rodriguez, Storm tossed it into the road and returned to help perform CPR on Danaher.
Ricky Johnson
Johnson testified that he was intoxicated, and he did not remember many details of the incident. He remembered walking down to the road, seeing Rodriguez, Rodriguez telling him "If you take two more steps, I'll shoot," jokingly taking two more steps, and getting shot. The next thing he remembered was lying in the ditch on the side of the road and trying to keep calm. Johnson testified that he was not sure if these memories were real because he was in a medically-induced coma for six days after the shooting.
Brandon Wilcox
Wilcox testified that he walked toward the road when he heard arguing. As Wilcox approached, he saw a man with a flashlight who said, "I'm filming. I'm recording." At some point, he heard someone mention that the man had a gun, but he never saw it. Several people called 911. The partygoers repeatedly asked Rodriguez to go home, but he refused.
Shortly after Storm drove up the driveway, Wilcox heard a gunshot. He was standing behind Stetson, who started running towards Rodriguez, and Wilcox instinctively followed him. Wilcox heard another gunshot, and saw Stetson, who had been struggling to disarm Rodriguez, fall. Rodriguez was still holding the gun, and Wilcox and eventually Storm fought with Rodriguez to disarm and subdue him.
Sandy Cox
Cox, Johnson's sister, testified that she attended the party. According to Cox, the partygoers turned down the music after a police officer asked them to do so, and they did not turn it up again. She left the party with her family shortly before the confrontation occurred.
Testimony of officers, investigators, & medical personnel
Deputy J. Soto with the Harris County Sheriff's Office testified that many of the partygoers were intoxicated, but he did not smell any alcohol on Rodriguez. He testified that the partygoers were extremely upset and that he wrote in his offense report that they were "aggressive."
Detective J. Brown of the Harris County Sheriff's Office testified that Rodriguez had a concealed handgun license. Among other things at the scene of the shooting, Brown found a printout from the Constable's office about filing a noise complaint. Brown testified that Rodriguez sustained a *854 broken leg in the altercation following the shooting.
Rmod Gumpeni, an assistant medical examiner at the Harris County Institute of Forensic Sciences, performed Danaher's autopsy. Danaher had two gunshot wounds, one to the chest and one to the right leg. Gumpeni concluded, based on the lack of stippling on Danaher's shirt or skin, that the gun was more than 18 to 24 inches away from Danaher when it was fired. Gumpeni testified that Danaher had a blood alcohol content of 0.21.
Testimony of neighbors and Rodriguez's ex-wife
Ken Ellis
Ellis, who lived across the street from Rodriguez, testified that around midnight on the night of the party, he was outside on his porch and could hear music playing at the Danaher house. Ellis heard a shout from the street and saw Rodriguez in an angry, agitated state walking down his driveway and into the road towards the Danaher house. Rodriguez was waving a flashlight and "shouting towards the Danahers to turn [the] music down." Rodriguez repeatedly yelled, "Shut it down. Shut it down. Shut it down," and "Turn it down. Turn it down." Ellis testified that Rodriguez's "whole manner was aggressive." Eventually, Ellis lost sight of Rodriguez behind the trees.
Ellis testified that his first thought when he saw Rodriguez storming into the road was, "Here we go again," because he had twice witnessed Rodriguez confront someone in the past. In both instances, Rodriguez moved his clothes to reveal his gun, and the other person walked away. After the first of these two incidents, Rodriguez told Ellis that "he could have shot the guy and he wouldn't be punished." On cross-examination, Ellis acknowledged that the first confrontation he had witnessed happened on Rodriguez's front porch and Ellis was too far away to hear what was said. Ellis also testified that Rodriguez had advised him to put purple marking on the tree-line of his property so that if anyone came on his property, he could shoot them.
Terry Hackathorn
Hackathorn, who lived with Ellis, testified that after she had an argument with a neighbor regarding her dogs, Rodriguez told her:
that as neighbors, you know, with a-the way the law was written, if I gave him permission to protect my property, then he could, in the event if I needed help, be able to protect me or my property if that meant shooting anyone or what have you.
Rodriguez also told her:
that if you put purple paint on your trees, that indicates to people that property is private property. And if anyone crosses that line, then you have a right to protect your home or property if that meant shooting or what have you.
Hackathorn also testified that a month before the shooting, she had a conversation with Rodriguez about the law of self-defense in Texas. Rodriguez told her that there was
a new law that you have the right to stand your ground if you fear for your life. You can protect-if you kill somebody, then you are protected under the law not to be prosecuted if you made sure you explained that you were in fear of your life and you stood your ground.
Q. Okay. So did he make it clear that you had to say you were in fear of your safety?
A. Yes.
Q. Do you recall him saying anything else about that?
A. He just said that if you-if I had to shoot somebody, make sure that the-they-that he comes or whoever understood *855 I was in fear for my life. And then you can drop-you know, drop-shoot the son of a b* *ch or whatever. And they can't do a damn thing to me.
Hackathorn testified that Ellis woke her up after he heard the gunshots, and they walked down towards the street to see what had happened. When they realized someone had been shot and Rodriguez was involved, Hackathorn went to Rodriguez's house to let his wife know.
Pete Fornols
Fornols lived between Danaher and Rodriguez. On the day before the party, Danaher came over to Fornols's house to borrow some tools. Rodriguez arrived shortly after Danaher left and asked Fornols, "What did that cock sucker want?" Fornols said that Danaher had borrowed some tools, and Rodriguez responded that he "wouldn't loan that son-of-a-b* *ch the sweat off his balls if he was dying of thirst." Rodriguez went on to say, "That's one of the son-of-a-b* *ches that keep us awake at night with the loud music."
On the night of the party, Rodriguez called Fornols three times in the span of a few minutes to ask him if he "was hearing all that s* *t that was coming from next door." Fornols testified that the music from the party was not bothering him, and he told Rodriguez that if it was bothering him, he should go inside. Rodriguez responded that he shouldn't have to, and asked Fornols "if it kept going, would [he] go down the street with him and put a stop to this s* *t." Rodriguez then came over to Fornols's house around 8:00 p.m. He had two handguns visible, one tucked into the front of his pants and one tucked into the back. Rodriguez was agitated and asked Fornols, "Hey, Bud, if this continues, will you go down the street with me and put a stop to this s* *t? I'll have your back." Fornols told him no. He was concerned about going with Rodriguez because of Rodriguez's state; accordingly to Fornols, "[h]e wasn't just going to be going out and hassling them" about the music, but was looking for a "big argument."
Around 10:00 p.m., Rodriguez again called Fornols and asked him to call the police to complain about the noise. Hoping it would calm Rodriguez down, Fornols agreed to call. Rodriguez called Fornols again at 11:13 p.m. to complain that the police did not do anything: "Those son-of-a-b* *ches came out and they sat on the side of the street. They didn't do shit and drove off." Rodriguez couldn't "believe that [the music was] still going on" and that "[n]othing ha[d] been done about it." He was "[v]ery agitated," much more than he had been when he visited Fornols's house earlier in the evening. Fornols went to bed and was awoken by the gunshots. He discovered that he had missed two more calls from Rodriguez while he was sleeping, one at 12:01 a.m. and one at 12:11 a.m. In total, Rodriguez called Fornols 13 times the night of the shooting.
Donna Malone
Rodriguez's ex-wife,[2] Donna Malone, testified. Rodriguez objected to Malone testifying regarding statements he made the day of the shooting on the basis of spousal privilege, but the trial court overruled the objection. Malone testified that, on the day of the shooting, as they drove past the Danaher house on the way to Walmart, Rodriguez said, "[T]hey're going to shut that down." Malone testified that Rodriguez seemed "[c]onfident that it would stop." They returned home from Walmart around 9:00 p.m., and as they drove by the Danaher house, Rodriguez said, "They're still at it." When they got home and out of the car, Rodriguez asked Malone "if [she]
*856 could hear that crap." She responded, "Yeah," but "didn't think anything about it."
Later that evening, Rodriguez told her that he was going to call the Constable's office because "the music was loud, and he was going to get it shut down." Malone testified that Rodriguez got more agitated as the night went on and was pacing in and out of the house. Around midnight, Rodriguez came into the house, called the Constable's office again, got his video camera, and said, "I'm going back out there." Malone went to bed and was awakened later when she got a phone call from her son and heard Hackathorn knocking on her door.
At the close of the guilt-innocence phase, the jury found Rodriguez guilty of murder.
Evidence During the Punishment Phase
The State called ten witnesses during the punishment phase, including a number of Rodriguez's neighbors, his two ex-wives, Malone and Ginger Rodriguez, his former stepson, James Coleman, and Danaher's mother. Rodriguez called two witnesses, his sister and his mother. At the close of the punishment phase, the jury sentenced Rodriguez to life in the Institutional Division of the Texas Department of Criminal Justice.
Jury Charge
Rodriguez contends that the trial court erred by (1) instructing the jury on provocation in the guilt-innocence jury charge, and (2) not including a sudden passion instruction in the punishment jury charge. Neither constituted error.
A. Standard of Review
In analyzing a jury-charge issue, our first duty is to decide if error exists. See Almanza v. State , 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g); Tottenham v. State , 285 S.W.3d 19, 30 (Tex. App.-Houston [1st Dist.] 2009, pet. ref'd). Only if we find error do we then consider whether an objection to the charge was made and analyze for harm. Tottenham , 285 S.W.3d at 30 ; see also Warner v. State , 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) ("The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary for reversal.").
B. Provocation
Rodriguez contends that the trial court erred by instructing the jury on provocation. It did not.
1. Applicable Law
The Texas Penal Code plainly provides that a person is not justified, as a matter of self-defense, in using force against another if the actor provoked the person against whom the force was used. See TEX. PENAL CODE §§ 9.31(b)(4), 9.32(a)(1). "[A] charge on provocation is required when there is sufficient evidence:
(1) that the defendant did some act or used some words that provoked the attack on him,
(2) that such act or words were reasonably calculated to provoke the attack, and
(3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other."
Elizondo v. State , 487 S.W.3d 185, 197 (Tex. Crim. App. 2016) (quoting Smith v. State , 965 S.W.2d 509, 513 (Tex. Crim. App. 1998) ).
In deciding whether to include a provocation instruction, the trial court must "decide whether evidence has been presented that could support a jury's finding on all three elements of provocation beyond a reasonable doubt." Id. (emphasis omitted). In reviewing the trial court's decision *857 to include a provocation instruction, the appellate court views "the evidence in the light most favorable to giving the instruction," resolving conflicts in the evidence and drawing reasonable inferences in favor of the instruction. See Smith , 965 S.W.2d at 514.
2. Analysis
The trial court did not err because sufficient evidence supported a jury finding on each of the three elements of provocation. We examine each in turn, viewing the evidence in the light most favorable to giving the instruction. See Smith , 965 S.W.2d at 514.
a. Defendant did some act or used some words to provoke the attack.
The trial court did not err in finding sufficient evidence to permit a rational jury to conclude that Rodriguez committed some act or used some words that provoked the attack on him. Evidence revealed Rodriguez shining his flashlight onto the Danaher property and yelling about the noise. Evidence then showed Rodriguez pulling his gun on Danaher early in the interaction, and without basis.
The jury was entitled to conclude that Rodriguez's pointing his gun at Danaher was an unjustified act designed to provoke Danaher and the other partygoers. Accordingly, there was sufficient evidence to permit the jury to make a positive finding on the first element of provocation.
b. Defendant's acts or words were reasonably calculated to provoke the attack.
The trial court also did not err with regard to the second factor. There was sufficient evidence to permit a rational jury to conclude that Rodriguez's actions and words were reasonably calculated to provoke an attack. Although Rodriguez asserted that he carried a video camera to document his noise complaint, a reasonable jury could have concluded that his narration on the video was intended to bolster a claim of self-defense-suggesting that he knew he would provoke an attack. In addition, evidence showed that Rodriguez harbored a particular animus towards Danaher. For instance, Fornols testified that, earlier in the day, Rodriguez had called Danaher a "cock sucker," and said he "wouldn't loan that son-of-a-b* *ch the sweat off his balls if he was dying of thirst." Rodriguez also pulled his gun on Danaher early in the interaction, and he pulled it again after the partygoers had repeatedly urged him to go home. In light of all of this, there was sufficient evidence to permit the jury to make a positive finding on the second element of provocation.
c. Defendant acted or spoke with the intent that defendant would have a pretext for inflicting harm upon the other.
Finally, the trial court did not err in determining that there was sufficient evidence to permit a rational jury to conclude that Rodriguez acted or spoke with the intent that he would have a pretext for inflicting harm on Danaher.
Evidence showed that, prior to the shooting, Rodriguez informed his neighbor that a claim of self-defense could be a shield in the case of murder: "[Y]ou have the right to stand your ground if you fear for your life. You can protect-if you kill somebody, then you are protected under the law not to be prosecuted if you made sure you explained that you were in fear of your life and you stood your ground."
Furthermore, on the video, Rodriguez repeatedly said variations of, "I'm in fear for my life," while bewildered partygoers asked him why he was making these statements, called the police to report his behavior, and told him to go home. All of *858 that, coupled with the fact that he pulled his gun on Danaher very early in the interaction, provided sufficient evidence to permit the jury to make a positive finding on the third element of provocation.
Because the trial court did not err in determining that sufficient evidence supported the jury's finding beyond a reasonable doubt on all three elements of provocation, we overrule Rodriguez's second issue. See Elizondo , 487 S.W.3d at 197.
C. Heat of Passion
Rodriguez similarly contends that the trial court erred by not including a sudden passion instruction in the punishment jury charge. We again disagree.
1. Applicable Law
"At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE § 19.02(d). Sudden passion is "passion directly caused by and arising out of provocation by the individual killed" that "arises at the time of the offense" and is not just the result of former provocation. Id. § 19.02(a)(2). Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Id. § 19.02(a)(1). As the Penal Code makes clear, sudden passion is an extreme emotional and psychological state. Dukes v. State , 486 S.W.3d 170, 180 (Tex. App.-Houston [1st Dist.] 2016, no pet.) (citing Saldivar v. State , 980 S.W.2d 475, 506 (Tex. App.-Houston [14th Dist.] 1998, pet. ref'd) ).
A sudden passion instruction is justified if the record supports an inference:
(1) that the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment;
(2) that his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper;
(3) that he committed the murder before regaining his capacity for cool reflection; and
(4) that a causal connection existed "between the provocation, passion, and homicide.
Id. (quoting Wooten v. State , 400 S.W.3d 601, 605 (Tex. Crim. App. 2013) ). The evidence supporting a sudden passion instruction may be weak, impeached, contradicted, or unbelievable. Id. If the evidence raises the issue of sudden passion, during either phase of trial, the defendant has satisfied his burden, and the trial court must submit the issue in the jury charge on the defendant's request. Id.
Nonetheless, neither ordinary anger nor fear alone raises an issue of sudden passion arising from adequate cause. Moncivais v. State , 425 S.W.3d 403, 407 (Tex. App.-Houston [1st Dist.] 2011, pet. ref'd) (citing Hernandez v. State , 127 S.W.3d 206, 211, 214 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd) ). And "[t]he mere fact that a defendant acts in response to the provocation of another is not sufficient to warrant a charge on sudden passion." Trevino v. State , 100 S.W.3d 232, 241 (Tex. Crim. App. 2003). Moreover, a defendant may not rely on a cause of his own making to support an argument for sudden passion. Moncivais , 425 S.W.3d at 407 (citing Smith v. State , 355 S.W.3d 138, 147 (Tex. App.-Houston [1st Dist.] 2011, pet. ref'd) ); Hernandez , 127 S.W.3d at 211 ; see also *859 Trevino v. State , 157 S.W.3d 818, 822 n.4 (Tex. App.-Fort Worth 2005, no pet.) (stating that defendant's conduct led complainant to fire gun at him and therefore complainant's conduct did not constitute adequate cause). Evidence that a person shot someone because he believed that person posed a threat to his life, without more, does not support giving a sudden passion instruction. Griffin v. State , 461 S.W.3d 188, 193-94 (Tex. App.-Houston [1st Dist.] 2014, no pet.) (citing Daniels v. State , 645 S.W.2d 459, 460 (Tex. Crim. App. 1983) ).
2. Analysis
On this record, the trial court did not err in determining that the evidence did not raise the issue of sudden passion. At most, the evidence Rodriguez cites in support of his argument for a sudden passion instruction is relevant to whether he acted out of fear or because he was provoked. But the mere allegation that Rodriguez may have acted in response to provocation, or shot because he feared that the partygoers would hurt or kill him, is not enough alone to support a sudden passion instruction. See Trevino , 100 S.W.3d at 241 ("The mere fact that a defendant acts in response to the provocation of another is not sufficient to warrant a charge on sudden passion."); Daniels , 645 S.W.2d at 460 (evidence defendant shot complainant because complainant was reaching for gun and defendant believed complainant would kill him showed capacity for reflection); Griffin , 461 S.W.3d at 193-94 (evidence that defendant shot complainant because he feared complainant would draw his gun did not support sudden passion instruction). Because no evidence demonstrates that Rodriguez acted under the immediate influence of terror, anger, rage, or resentment, we hold that the trial court did not err by denying Rodriguez's request for a sudden passion instruction.
We overrule Rodriguez's fifth issue.
Sufficiency of the Evidence
Rodriguez also asserts a sufficiency of the evidence challenge. But sufficient evidence supported his conviction.
A. Standard of Review and Applicable Law
When evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ; Brooks v. State , 323 S.W.3d 893, 898-99 (Tex. Crim. App. 2010). We defer to the responsibility of the factfinder to fairly resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from the facts. See Jackson , 443 U.S. at 319, 99 S.Ct. at 2789 ; Brooks , 323 S.W.3d at 898-99. In so doing, we may not reevaluate the weight and credibility of the record evidence and thereby substitute our own judgment for that of the factfinder. Id. This standard applies equally to circumstantial and direct evidence. Laster v. State , 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009).
A person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE § 19.02. A "person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Id. § 9.31(a). Deadly force is justified "to protect the actor against" another's "use or attempted use of unlawful deadly force." Id. § 9.32(a)(2)(A).
*860 The defendant bears the initial burden to produce evidence supporting a justification defense. Zuliani v. State , 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces some evidence, the State then bears the burden of persuasion to disprove the raised defense. Id. The burden of persuasion does not require the State to produce evidence; it requires only that it prove its case beyond a reasonable doubt. Id. ; Hernandez v. State , 309 S.W.3d 661, 665 (Tex. App.-Houston [14th Dist.] 2010, pet. ref'd). Thus, to convict a defendant of murder after he has raised the issue of self-defense, the State is required to prove the elements of the offense beyond a reasonable doubt and to persuade the jury beyond a reasonable doubt that the defendant did not kill in self-defense. Zuliani , 97 S.W.3d at 594 ; McClesky v. State , 224 S.W.3d 405, 409 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd).
B. Analysis
Sufficient evidence supported the conviction here. Put simply, the jury was entitled to draw its own conclusions based on the evidence, and it was not required to accept Rodriguez's defense theory, including the explanations he provided. For instance, Rodriguez asserted that the fact that he had a video camera proved that he was trying to document his noise complaint. But, as the State argues, the jury could have found that Rodriguez took the video camera to document his unfounded claims that he feared for his life. This is especially true in light of Rodriguez's comment to his neighbor suggesting that, so long as he could show he feared for his life, Rodriguez believed the State "can't do a damn thing"-even if he committed murder. It is also telling that, instead of approaching the Danahers' house to ask them to turn down the music, Rodriguez stayed in the road and pointed his flashlight at the house. The State argued that this was proof that Rodriguez was trying to lure the partygoers down to the road, where he would have the "right" to shoot. Beyond this, evidence showed that Rodriguez pulled his gun on Danaher early in the encounter, when Danaher was not a threat to him. And, as explained above, the evidence would have permitted a rational jury to conclude that Rodriguez provoked the confrontation.
In short, there was considerable evidence undermining Rodriguez's claim of self-defense that the jury could have credited. Thus, a rational jury could have reasonably rejected Rodriguez's self-defense claim and concluded beyond a reasonable doubt that he committed murder. See Zuliani , 97 S.W.3d at 594.
We overrule Rodriguez's first issue.
Evidentiary Rulings
Finally, Rodriguez argues that the trial court erred by (1) admitting in the guilt-innocence phase, over his Rule 504 spousal-privilege objection, Malone's testimony about statements he made on the day of the shooting, and (2) admitting extraneous offense evidence during the punishment phase of trial. Once again, we reject his contentions.
A. Standard of Review
We review a decision to admit or exclude evidence for an abuse of discretion. Martinez v. State , 327 S.W.3d 727, 736 (Tex. Crim. App. 2010) (citing Green v. State , 934 S.W.2d 92, 104 (Tex. Crim. App. 1996) ). We will not reverse a trial court's ruling on an evidentiary matter unless the decision was "clearly outside the zone of reasonable disagreement." Winegarner v. State , 235 S.W.3d 787, 790 (Tex. Crim. App. 2007) ; see Taylor v. State , 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing Zuliani , 97 S.W.3d at 595 ). We uphold a trial court's evidentiary ruling if it was *861 correct on any theory of law applicable to the case. De La Paz v. State , 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) (citing Sewell v. State , 629 S.W.2d 42, 45 (Tex. Crim. App. 1982) ).
Moreover, even if a trial court errs by improperly admitting evidence, reversal is warranted only if the appellant demonstrates that the erroneous admission affected his substantial rights. TEX. R. APP. P. 44.2(b) ; Kibble v. State , 340 S.W.3d 14, 20 (Tex. App.-Houston [1st Dist.] 2010, pet. ref'd) ; Cruz v. State , 238 S.W.3d 381, 386 (Tex. App.-Houston [1st Dist.] 2006, pet. ref'd). An error affects an appellant's substantial rights "when it has a substantial and injurious effect or influence in determining the jury's verdict." Cruz , 238 S.W.3d at 386 (citing Johnson v. State , 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) ). An error that did not influence the jury or had but a slight effect on the jury is not reversible. Motilla v. State , 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (nonconstitutional error not grounds for reversal if, "after examining the record as a whole," there is "fair assurance that the error did not influence the jury, or had but a slight effect"); McRae v. State , 152 S.W.3d 739, 744 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd). In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. McRae , 152 S.W.3d at 744 (citing Bagheri v. State , 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) ). We also consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. Id.
B. Rule 504
Rodriguez argues that the trial court erred by admitting, over his Rule 504 spousal-privilege objection, Malone's testimony about statements he made the day of the shooting.
With exceptions not relevant here, Rule 504(a) of the Texas Rules of Evidence recognizes a confidential communication privilege for spouses-i.e., a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made to a spouse. TEX. R. EVID. 504(a)(2). Both the communicating spouse and the communicated-to spouse have the authority to assert the privilege, and the privilege survives the termination of the marriage with regard to communications made while the individuals were married. Id. 504(a)(2), (3). A communication is "confidential" for these purposes if a person makes it privately to the person's spouse and does not intend its disclosure to any other person. Id. 504(a)(1).
Rodriguez complains that his ex-wife testified to the following three statements that he made on the day of the shooting:
(1) He stated, "They're going to shut that down" as he and Malone drove by the Danaher home on the way to Walmart earlier in the evening;
(2) He declared, "They're still at it. Can you hear that crap?" when they drove by the Danaher home on the way back from Walmart; and
(3) He proclaimed, "I'm going back out" as Rodriguez left his home with the video camera for the last time before the shooting.
Even if we were to assume that the trial court erred in admitting Malone's testimony as to these three statements, the admission was harmless. Rodriguez provides no basis to find that these statements had a substantial and injurious effect or influence *862 in determining the jury's assessment of punishment. See Cruz , 238 S.W.3d at 386. To the contrary, the record shows that this evidence was cumulative because Rodriguez voluntarily disclosed essentially the same information to his neighbors. See McRae , 152 S.W.3d at 744. For instance, Fornols testified about Rodriguez's behavior and statements on the night of the shooting, and many of the statements that Fornols recalled were very similar to-or even more damning than-those testified to by Malone. Specifically, Fornols testified that Rodriguez called him repeatedly to complain about the noise and to ask him to go to Danaher's house with him and "put a stop to this s* * *." Rodriguez then came over to Fornols's house with two guns tucked into his pants. Rodriguez was "agitated" and again asked Fornols to "go down the street with [him] and put a stop to this s* * *," telling Fornols, "I'll have your back." Concerned about Rodriguez's state, Fornols refused. Rodriguez returned home, but continued to call Fornols to complain about the noise, becoming "[v]ery agitated" and "a lot more upset ... than he was earlier in the evening."
Likewise, Ellis testified that he saw Rodriguez when Rodriguez was on his way to Danaher's house. Ellis described Rodriguez as "angry," "agitated," and "aggressive." Rodriguez was waving his flashlight and shouting to the Danahers to turn down the music. Ellis heard Rodriguez repeatedly shout, "Shut it down. Shut it down. Shut it down."
In short, after examining the record as a whole, we have fair assurance that the admission of Malone's testimony regarding these three statements, even if erroneous, did not influence the jury or had but a slight effect. See Motilla , 78 S.W.3d at 355. Because this testimony was essentially duplicative of other evidence, any error in its admission was harmless. See McRae , 152 S.W.3d at 744-45.
We overrule Rodriguez's sixth issue.
C. Punishment-Phase Extraneous Offense Evidence
In his final issues, Rodriguez contends that the trial court erred by admitting extraneous offense evidence during the punishment phase of trial.
1. Applicable Law
Article 37.07 of the Code of Criminal Procedure provides that during the punishment phase of trial, evidence as to any matter deemed relevant to sentencing may be admitted, including evidence of an extraneous offense shown beyond a reasonable doubt to have been committed by the defendant. TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1). Evidence is relevant to sentencing if it is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." Rodriguez v. State , 203 S.W.3d 837, 842 (Tex. Crim. App. 2006). This evidence includes, but is not limited to, evidence regarding:
the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.
TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1) (emphasis added); see Fields v. State , 1 S.W.3d 687, 688 (Tex. Crim. App. 1999).
*863 Prior crimes or bad acts are introduced to provide additional information that the jury may consider in determining what sentence the defendant should receive. Arthur v. State , 11 S.W.3d 386, 392 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) (quoting Fields , 1 S.W.3d at 688 ).
The statutory language grants wide latitude in the admission of evidence deemed relevant. See Contreras v. State , 59 S.W.3d 362, 365 (Tex. App.-Houston [1st Dist.] 2001, no pet.) ; see also Lamb v. State , 186 S.W.3d 136, 141 (Tex. App.-Houston [1st Dist.] 2005, no pet.) (trial court has wide discretion in determining admissibility of evidence presented at punishment phase). We review a trial court's decision to admit extraneous offense evidence during the punishment phase of trial under an abuse of discretion standard. Mitchell v. State , 931 S.W.2d 950, 953 (Tex. Crim. App. 1996).
Relevant here, article 37.07 includes a notice provision. "On timely request of the defendant, notice of intent to introduce evidence under [ article 37.07 ] shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." TEX. CODE CRIM. PROC. art. 37.07, § 3(g). Rule 404(b) requires that "the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence-other than that arising in the same transaction-in its case-in-chief." TEX. R. EVID. 404(b) ; see Worthy v. State , 312 S.W.3d 34, 37 (Tex. Crim. App. 2010). This notice requirement prevents surprise. Gonzalez v. State , 337 S.W.3d 473, 485 (Tex. App.-Houston [1st Dist.] 2011, pet. ref'd). "The admission of an extraneous offense into evidence during the punishment phase when the State failed to provide notice required by statute is non-constitutional error," and a judgment is subject to reversal only if the appellant demonstrates that the error affected his substantial rights. Id. at 485-86 (first quoting Ruiz v. State , 293 S.W.3d 685, 695 (Tex. App.-San Antonio 2009, pet. ref'd) ; then citing Roethel v. State , 80 S.W.3d 276, 281 (Tex. App.-Austin 2002, no pet.) ). "When substantively admissible Rule 404(b) evidence is improperly admitted because of the State's failure to comply with the Rule 404(b) notice provision," the error did not affect the defendant's substantial rights "if the defendant was not surprised by the evidence." See id. at 485 (quoting Hernandez v. State , 176 S.W.3d 821, 825 (Tex. Crim. App. 2005) ).
Finally, although the trial court has wide latitude in determining the admissibility of punishment-phase evidence, the evidence must still satisfy Rule 403 of the Texas Rules of Evidence. Lamb , 186 S.W.3d at 143. Relevant evidence may be excluded pursuant to Rule 403 if "its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403 ; see Lamb , 186 S.W.3d at 143. Thus, relevant evidence that is otherwise admissible under article 37.07 is inadmissible if it does not satisfy Rule 403. Lamb , 186 S.W.3d at 144. When a party objects under Rule 403, the trial court balances several factors, including (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.
*864 Gigliobianco v. State , 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). The trial court is presumed to have conducted the proper balancing test if it overrules a 403 objection, regardless of whether it conducted the test on the record. See Williams v. State , 958 S.W.2d 186, 195-96 (Tex. Crim. App. 1997).
2. 37.07 Notice
Rodriguez contends that the trial court abused its discretion by overruling his objection under article 37.07 because the State failed to provide notice of its intention to offer his ex-wife Ginger's testimony that (1) Rodriguez called her an "albino b* * * *," a "loser," and "worthless," (2) pulled over an 18-wheeler using his Navy-issued badge, and (3) pushed her when they lived in Montgomery County, Texas.
As an initial matter, the record reflects that the State filed a notice that it intended to introduce evidence of numerous bad acts, including the second and third acts about which Rodriguez complains:
• "On or about 1988 in Montgomery County, the Defendant committed the offense of Impersonating a Police Officer by showing his Navy badge and inducing a truck driver to pull over," and
• "On or about 1995 in Montgomery County, Texas the Defendant committed the offense of Assault-Family Violence on Ginger Rodriguez by pushing her with his hand."
Because Rodriguez received notice regarding these acts, the trial court did not abuse its discretion in overruling his notice objection about them.
With respect to Ginger's testimony that Rodriguez called her an "albino b* * * *," a "loser," and "worthless," we conclude that, even if the trial court were to have erred by admitting this testimony, the admission was harmless. Rodriguez provides no basis to find that this single piece of testimony showing that he called his ex-wife names had a substantial and injurious effect or influence in determining the jury's assessment of punishment. See Cruz , 238 S.W.3d at 386. Considering everything in the record, including the testimony by numerous witnesses about other arguably-worse extraneous offenses, the fact that the jury had already concluded that Rodriguez was guilty of murder, and the relative unimportance and lack of focus on this single piece of testimony, we conclude that admission of this evidence did not affect Rodriguez's substantial rights. See McRae , 152 S.W.3d at 744. Accordingly, any alleged error in the admission of this evidence does not constitute reversible error. See Motilla , 78 S.W.3d at 355.
We overrule Rodriguez's third issue.
3. Rule 403
In his last issue, Rodriguez contends that the trial court abused its discretion by overruling his Rule 403 objections during the punishment phase to the admission of (1) Coleman's testimony that Rodriguez shot a dog with a BB gun and made Coleman bury the dog alive, and (2) copies of text messages showing Rodriguez's adulterous communications with another woman. Rodriguez argues that the prejudicial effect of this evidence outweighed its probative value.[3]
a. Coleman's testimony
Rodriguez argues that the trial court erred by admitting Coleman's testimony *865 that Rodriguez made Coleman bury a dog alive after Rodriguez shot it with a BB gun. Rodriguez contends that this evidence was unduly prejudicial under Rule 403 because it was "purely inflammatory."
Even if we were to assume that the trial court erred in admitting Coleman's testimony regarding this incident, Rodriguez has not demonstrated that the admission affected his substantial rights. TEX. R. APP. P. 44.2(b). In approaching punishment, the jury had already concluded that Rodriguez murdered the unarmed Danaher, and did so based upon strong evidence, including the testimony of numerous witnesses. See McRae , 152 S.W.3d at 744. The evidence also showed that Rodriguez harbored a particular animus against Danaher and the volume of the music played at the Danaher house.
Further, the jury heard evidence concerning numerous extraneous offenses-evidence about which Rodriguez does not complain on appeal-and that evidence would have had at least as much effect as the evidence at issue here. For example, Fornols testified that he found a dead dog under his house and, after talking with Rodriguez, removed the dog and saw that it had been shot in the stomach. Another neighbor, David Johnson, testified that he witnessed Rodriguez repeatedly shoot with a pellet gun a dog that was tied to a tree and had no use of its back legs. After telling Rodriguez to stop tormenting the dog, Johnson called the police. Moreover, Malone testified that she was afraid to leave Rodriguez after the shooting because she feared him hurting her or her children; he told her that if he "went off on someone" they would "get the same thing that happened that night." She also testified that Rodriguez told her that if the neighbor's dogs came into their yard, she "could shoot them." And Ginger testified that she witnessed Rodriguez shoot dogs; sometimes he would kill them and sometimes he would only wound them. She also witnessed him poison cats.
Rodriguez does not challenge any of this evidence on appeal. Coleman's complained-of testimony about a single instance of animal cruelty is therefore insignificant in comparison to the totality of the evidence adduced at trial and, if it influenced the jury at all, would have had but a slight effect. See ids="9043267" index="90" url="https://cite.case.law/sw3d/152/739/#p744">id.
b. Text messages
Finally, Rodriguez argues that the trial court erred by admitting print-outs of adulterous text messages he sent the night of the shooting. Rodriguez contends that this evidence was unduly prejudicial under Rule 403 because it was "purely inflammatory."
Again, even if we were to assume that the trial court erred in admitting this text message evidence, Rodriguez has not demonstrated that the admission affected his substantial rights. See TEX. R. APP. P. 44.2(b). As discussed above, the evidence supporting the jury's guilty verdict was strong, and the evidence submitted during the punishment phase was substantial. See McRae , 152 S.W.3d at 744-45. In addition, Ginger testified that Rodriguez sent and received adulterous texts, and Rodriguez did not object to her testimony. The text messages and their content were not a focus during punishment, and they were not even mentioned in the punishment-phase closing arguments. See ids="9043267" index="92" url="https://cite.case.law/sw3d/152/739/#p744">id. In short, the evidence was insignificant in comparison to the totality of the evidence adduced at trial. See ids="9043267" index="93" url="https://cite.case.law/sw3d/152/739/#p744">id.
We cannot conclude that the admission of Coleman's testimony or the text messages, if erroneous, affected Rodriguez's substantial rights. We therefore hold that any alleged error in the admission of this evidence would not constitute reversible error. See TEX. R. APP. P. 44.2(b) ;
*866 Solomon v. State , 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) ; McRae , 152 S.W.3d at 744.
We overrule Rodriguez's fourth issue.
Conclusion
We affirm the trial court's judgment.

This is the second appeal in this case. This Court reversed Rodriguez's first conviction and remanded for a new trial due to jury charge error. See Rodriguez v. State , 456 S.W.3d 271 (Tex. App.-Houston [1st Dist.] 2015, pet. ref'd).

She divorced Rodriguez after the shooting.

Rodriguez also complains that this evidence was irrelevant, but he did not object on this ground in the trial court and obtain a ruling. He thus did not preserve this argument. See Tex. R. App. P. 33.1(a) (to preserve complaint for appellate review, appellant must have made specific and timely complaint to trial court and obtained ruling); Lovill v. State , 319 S.W.3d 687, 691-92 (Tex. Crim. App. 2009) (complaint is not preserved for appellate review if legal basis for complaint on appeal varies from complaint made at trial).