# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00262-CR

**Marques Eugene Guntz, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 15-0406-K277, HONORABLE STACEY MATHEWS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N[1]

A jury found appellant Marques Eugene Guntz guilty of assault involving dating violence, a third-degree felony. *See* Tex. Penal Code § 22.01(b)(2). Guntz argues in one issue that legally insufficient evidence supports the jury's rejection of his self-defense claim. For the reasons that follow, we will affirm.

## BACKGROUND

Catherine Fletcher and Guntz dated from December of 2012 until Fletcher broke off the relationship in January of 2015 because she believed that Guntz had been "talking to other

---

[1] Notice of appeal for this case was originally filed in this Court in December 2016, at which time the case was transferred to the El Paso Court of Appeals in compliance with a docket-equalization order issued by the Texas Supreme Court. On April 12, 2018, the Texas Supreme Court ordered that certain cases be transferred back to this Court from the El Paso Court, and we consider this appeal pursuant to that order. *See* Misc. Docket No. 18-9054 (Tex. Apr. 12, 2018) (per curiam).

women." Approximately two weeks later, Fletcher took her dog for an evening walk. When she returned, Guntz was waiting in front of her apartment with wine and flowers. Guntz tried to convince her to get back together, and Fletcher invited him in so that they could "hash things out" and then "walk away" from the relationship. Once in the apartment, Fletcher lay down on the couch and Guntz sat on an ottoman nearby. Fletcher and Guntz had several alcoholic drinks each while they discussed, in Fletcher's words, "everything leading up to" the end of their relationship. Fletcher and Guntz testified to different versions of how the discussion turned violent.

**Fletcher**

Fletcher testified that Guntz gave her his phone and demanded that she look through it for proof he had been seeing other women. Fletcher opened the phone's call history and immediately saw the name of a woman Guntz had dated in the past. Fletcher saw the number, laughed, and told Guntz that this confirmed she did not want to resume their relationship. Fletcher testified that Guntz immediately "pushed me back on the couch with both hands on my neck and began to strangle me" while "yelling at me that he was going to kill me." Fletcher began to lose consciousness but Guntz released her before she blacked out completely. As he moved away, Fletcher dialed 911 on her cell phone and put it in the pocket of her pants. Guntz was pacing the apartment yelling "I'm going to kill you," and "I'm going to fucking end you" but then decided to leave. Fletcher jumped up from the couch and moved between him and the door. Guntz grabbed her by the neck and threw her into the wall. As he left, Fletcher grabbed one of the back pockets of Guntz's pants and ripped it all the way down to the cuff of one leg. Fletcher explained at trial that

2

she tried to keep Guntz in the apartment because she hoped that police were on their way and because she "needed somebody to know what he had done" to her.

**Guntz**

According to Guntz, Fletcher saw a text message from a woman appear on his phone and screamed at him to leave. Guntz stood up and put on his sports coat, and Fletcher kicked him in the abdomen. Fletcher then held Guntz by his neck tie and hit him multiple times on the head. Guntz placed his left arm against her throat and pushed to create distance between them. Guntz's tie came over his head and he moved away from her. Guntz admitted that it was him on the 911 tape saying "I'm going to kill you," and "I'm going to fucking end you" at this point, but argues that he did not mean it literally. Rather, he was trying to de-escalate the situation without using violence. Guntz testified that Fletcher removed her phone from her bra, hung up the 911 call, and said "I've fucking got you now." Fletcher advanced towards him but tripped and fell to the floor. Fletcher reached up and tore Guntz's pants as he stepped over her on his way out the door.

**Trial**

In addition to Fletcher, the State presented testimony from Sergeant Michael Krogman and Detective John Combs of the Round Rock Police Department, Fletcher's neighbors Hannah Day and Chad Copeland, and the emergency room physician who treated her. The jury listened to a recording of the 911 call from Fletcher's phone and watched a visual recording of Guntz's interview with Detective Combs. The trial court also admitted crime scene photographs of

3

Fletcher's living room, photographs of Fletcher taken after the assault, and a bag containing a tie, shirt suspenders, and a torn pair of pants recovered from Fletcher's apartment.

Guntz testified to his version of the events inside of Fletcher's apartment and claimed that he acted in self defense. The trial court granted Guntz's request for a jury instruction on self defense and charged the jury accordingly.

The jury returned a verdict of guilty. The trial court sentenced Guntz by agreement to ten years' imprisonment, probated for five years, and a $2,500 fine. Guntz, a patrol officer with the Round Rock Police Department, also agreed to "permanently and unconditionally" surrender his peace officer's license. This appeal ensued.

## ANALYSIS

In one issue, Guntz asserts the evidence is legally insufficient to support the jury's rejection of his self-defense claim.

**Standard of Review and Applicable Law**

We evaluate the legal sufficiency of the evidence by viewing all of the evidence in the light most favorable to the verdict and determining whether a reasonable jury could have found each essential element of the offense beyond a reasonable doubt. *Cary v. State*, 507 S.W.3d 750, 755 (Tex. Crim. App. 2016). This standard requires us to defer to the jury's responsibility "to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We afford almost complete deference to the jury's

4

determinations of the credibility and weight of the evidence and may not substitute our own judgment. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012).

We measure the sufficiency of the evidence against the elements of the offense as defined by the hypothetically correct jury charge.[2] *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018). A hypothetically correct charge for this case required the State to prove beyond a reasonable doubt that Guntz (1) intentionally, knowingly, or recklessly, (2) caused bodily injury to Fletcher, (3) a person who had a dating relationship with him, by (4) "impeding the normal breathing or circulation of the blood of [Fletcher] by applying pressure to [her] throat or neck." *See* Tex. Penal Code § 22.01(b)(2). However, it is a defense that the actor "reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

A defendant claiming self defense bears the initial burden to produce some supporting evidence. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defendant produces some evidence to raise the issue, the State bears the burden of persuasion to disprove the defense. *Id.* The burden does not require the State to produce evidence, only that it prove its case beyond a reasonable doubt. *Id.* If the jury finds the defendant guilty, it has implicitly rejected the defense. *See Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991); *Rodriguez v. State*, 546 S.W.3d 843, 860 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Thus, to convict Guntz of

---

[2] A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018) (quoting *Malik v. State*, 953 S.W.2d 234, 238 (Tex. Crim. App. 1997)).

assault, the State had the burden to prove the elements of assault beyond a reasonable doubt and that he did not act in self defense. *See Rodriguez*, 546 S.W.3d at 860.

**Discussion**

Guntz contends the question of his guilt reduces to whether the jury believed his testimony or Fletcher's because the independent evidence supports both versions. Guntz argues that a rational jury could not believe Fletcher because she had assaulted him during a bar crawl in downtown Austin almost a year prior to the incident at issue here. Fletcher testified that she was the aggressor in that incident and there is no indication that she ever represented otherwise. The jury was entitled to conclude that Fletcher was being similarly truthful about what happened in her apartment. *See Merritt*, 368 S.W.3d at 525; *Schneider v. State*, 440 S.W.3d 839, 841 (Tex. App.—Austin 2013, pet. ref'd) (observing that the jury "can believe all, some, or none of the testimony presented"). And based on all of the evidence before the jury, we cannot say the jury's decision was an irrational one. *See Cary*, 507 S.W.3d at 757 ("[N]otwithstanding a court's deference to the jury's credibility and weight determinations, the jury's finding of guilt must be a rational one in light of all of the evidence presented at trial.").

The jury heard significant evidence and testimony that Guntz lied to investigating officers on multiple occasions. Sergeant Krogman testified that he and Sergeant Eric Mount went to Guntz's apartment following the incident to relieve him of duty. While there, they asked him about Fletcher's allegations, and Guntz denied that there had been any "physical contact" at all. Guntz told them he had been in Fletcher's apartment for 30 minutes and showed them an undamaged gray suit that he claimed to have worn that night. Guntz initially maintained this story during his

6

later interview with Detective John Combs, a recording of which was played for the jury. Both the recording and Combs' testimony reflect that Guntz denied the fact that Fletcher tore his pants fifteen times before admitting that it happened. Guntz also denied telling Krogman and Mount that there had been no violence.

Guntz admitted during his testimony that he can be heard on the 911 call, which was also played for the jury, saying "I will fucking kill you" three times but contends that he did not literally intend to kill Fletcher. Rather, he was following his training and attempting to de-escalate the situation with verbal commands. However, Fletcher can also be heard on the tape saying "stop" and "what happened" multiple times. After listening to the tape, we conclude that the jury could rationally decide that there was anger in Guntz's voice and confusion and fear in Fletcher's, a situation consistent with Fletcher's testimony that Guntz was the aggressor. Moreover, Detective Combs testified that based on his own training and experience, Guntz did not sound like he was trying to de-escalate a violent situation.

Fletcher's next-door neighbors, Hannah Day and Chad Copeland, testified that they heard parts of the argument from their apartment throughout the night. Day testified that starting around 8:30 p.m., she heard raised voices from Fletcher's apartment and that this continued "on and off" for "the next few hours." Day became concerned for Fletcher's safety several hours later because "the noises were getting louder" and no longer seemed like an ordinary argument. Copeland testified that he placed a glass up against the wall to listen to the argument and heard Fletcher say "[w]hy are you choking me? You're a police officer -- or you're a cop."

7

Viewing all the evidence in the light most favorable to the jury's verdict as we must, we conclude that a rational jury could find beyond a reasonable doubt both that the State proved each element of assault and that Guntz did not act in self defense.  We conclude the evidence is sufficient to support Guntz's conviction and overrule his sole issue on appeal.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   August 28, 2018

Do Not Publish