**Opinion issued December 13, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00732-CR

_____

**DONALD FOSTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1470046**

---

## MEMORANDUM OPINION

After appellant, Donald Foster, without an agreed punishment recommendation from the State, pleaded guilty to the felony offense of murder,[1] a

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b), (c) (Vernon 2011).

jury found him guilty, found he did not cause the death of the complainant, his wife, under the influence of sudden passion,[2] and assessed his punishment at confinement for life. In three issues, appellant contends that his trial counsel provided him with ineffective assistance during the punishment phase of trial and the trial court erred in admitting certain evidence during the punishment phase of trial and not sua sponte instructing the jury on the proper burden of proof for an extraneous offense or bad act.[3]

We affirm.

## Background

A Harris County Grand Jury issued a true bill of indictment, alleging that appellant, on or about May 29, 2015, "did then and there unlawfully, intentionally and knowingly cause the death of [the complainant] . . . by striking [her] with [a] sharp edge object," "a knife," or "a blunt force object." It further alleged that appellant, on or about May 29, 2015, "did then and there unlawfully intend to cause serious bodily injury to [the complainant] . . . and did cause the death of the [c]omplainant by intentionally and knowingly committing an act clearly dangerous

---

[2]  *See id.* § 19.02(a)(2), (d) ("'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.").

[3]  *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp. 2018).

2

to human life, namely . . . striking [her] with a sharp edge object," "a knife," or "a blunt force object."

At the punishment hearing, Cypress Creek EMS paramedic G. Ortega testified that on the morning of May 29, 2015, he was dispatched to an Inverness Forest apartment in response to a request for "a welfare check." Upon arrival, he entered the unlocked door of the apartment. Inside, he saw the complainant laying, face down, on the living room floor in "a large pool of . . . blood, dark fluid, around [her] entire body." She had "soft tissue disruption behind her neck" and her head, "different parts of [her] neck and her shoulder had [blood] staining," there were blood and puncture wounds on her clothes, and Ortega could see "open soft tissue." Because the complainant did not show any signs of life, Ortega exited the apartment for safety purposes. He then reported a possible stabbing or shooting and requested that law enforcement officers come to the location. Due to the condition of the complainant's body, Ortega opined that she had been injured shortly before his arrival.

Harris County Sheriff's Office ("HCSO") Crime Scene Unit Officer J. Ortiz testified that he was dispatched to an Inverness Forest apartment on May 29, 2015 to investigate "a homicide involving [the complainant, who] was found in the living room of [her] apartment, deceased." The complainant had been talking on the

telephone with her daughter, Lorie Ann Foster, "when something occurred." Lorie Ann then called for emergency assistance to perform "a welfare check."

Officer Ortiz noted that it appeared that the complainant's body had not been moved and there was "an amount of blood . . . gushing out from the sides of her body." She had "knife wounds," lacerations, and cuts on her body and multiple "defects" or tears in her clothing.[4] Ortiz saw "stab wounds" on the complainant's upper back and "upper side of [her] neck," and he opined that "all [of] the assault [had] t[aken] place around [her] neck" and upper back. He further noted that her arms were in "a defensive posture" and she had "defensive wounds" on her hands. Ortiz opined that the complainant had been stabbed several times, the stabbings indicated "a lot of anger" and "domestic violence," and "something violent" had occurred in the living room of her apartment. According to Ortiz, law enforcement officers later recovered a knife from appellant after he had "[a]ttempted to commit suicide" by "jump[ing] out in front of an 18-wheeler" truck. Although the truck swerved and did not kill appellant, he was taken to a hospital following the incident.

Oak Ridge North Police Department Officer M. Teske testified that on May 29, 2015, he was dispatched to the feeder road of a highway in response to an "auto/pedestrian accident." Upon arrival, Teske saw appellant on the ground with

---

[4]     Officer Ortiz noted that the complainant was wearing denim which constitutes "a real hard fabric to cut."

"several people attending to him." They had wrapped his arms in gauze, and he appeared to be in severe pain. At one point, a knife was removed from appellant's pocket, and after Teske put the knife in his patrol car, appellant "became more aggressive," "flailing his legs and kicking . . . and trying to sit up."

Officer Teske spoke to the driver of the truck in front of which appellant had jumped. The driver stated that appellant had "walked across the feeder road to the west side of" the road and "waited until the 18-wheeler [truck] came close." He then "dove out in front of [the truck,] head first with his arms outstretched." Although the driver of the truck had "swerve[d]," the "cab of the truck" hit appellant, and the "back left tires" of the cab ran over his arms. Teske opined that appellant, by jumping in front of the truck, had attempted to kill himself.

HCSO Officer A. Thompson testified that on May 29, 2015, he was dispatched to an Inverness Forest apartment. Upon entering the apartment, he saw the complainant "lying on the floor in a pool of blood." The cause of her death appeared to be "stab wounds." Thompson noted that there were two knives missing from the knife block in the kitchen of the apartment. And he opined that the scene looked like a "personal type killing" that had happened fast and "with a lot of rage."

Officer Thompson further testified that on the same day, appellant had "tried to jump in front of an 18-wheeler [truck]." When Thompson visited him in the hospital one or two days later, appellant was "still being treated for his injuries." He

5

had a cast on his arm, "something in his mouth or nose," and "an IV connected to him." Appellant, who could not pick up a glass of water, did not remember how he had gotten to the hospital, and Thompson opined that he could have been medicated while they spoke at the hospital. When Thompson told him that the complainant had died, appellant did not express any emotion, but did state that he did not mean to kill her.

Officer Thompson also noted that Lorie Ann had told him that she had learned about a rumor that the complainant and another individual, "Dr. Harris," were having an affair at the time of her death. Lorie Ann, however, did not believe the rumor. When Thompson spoke to appellant about the purported affair, he stated that the complainant was "being treated by Dr. Harris," and during "a visit," she had "hug[ged] him too long or kiss[ed] him." Afterward, appellant confronted the complainant and told her to "stop showing so much affection towards [Dr. Harris.]"

Appellant also disclosed to Officer Thompson that his family had been neglecting him and the complainant had called him "the trash man," telling him that she "didn't want to be anywhere around him." And when he tried to show her affection, "she would push him away." She "paid more attention to [Dr. Harris] than himself," she was closer with Dr. Harris than himself, and he had previously seen "photographs" on her cellular telephone. Appellant stated that he could not live without the complainant and he had previously told her that "he could not see them

6

split[ting] apart." And Thompson noted that Dr. Harris had admitted to the affair. Thompson opined, thus, that appellant's suspicions were in fact true.

Lorie Ann, who grew up in Jamaica, testified that appellant is her father, the complainant was her mother, and they were married for approximately twenty-six years. In 2010, the family moved to the United States, and in 2011, Lorie Ann and the complainant moved to Houston, Texas so that she could attend high school. Appellant then moved to Houston in 2013 or 2014.

In regard to the complainant, Lorie Ann testified that she "handl[ed] things directly for the family" and was supportive of Lorie Ann's education. She never missed birthdays or anniversaries and celebrated those types of events with Lorie Ann. The complainant had a bachelor's of arts degree in economics, management, and business, and she had a master's degree in Human Resources. While the family lived in Jamaica, the complainant, who was "[p]rimarily" responsible for paying for the family's housing, worked "as an administrator." And when she moved to Houston, she worked in Human Resources.

In regard to appellant, Lorie Ann testified that he was "less of a parent," "[n]ot a father figure" that she could "look up to," and not a person from whom she could seek advice. He was "selfish" with his time and his things, and he was not emotionally or financially supportive of the family. Appellant had made clear that he "would never leave [Lorie Ann] any financial help if he were to die" and "would

7

make sure that [she] suffer[ed]." Although he worked while the family lived in Jamaica, he was not working at the time of the complainant's death. And Lorie Ann did not know whether appellant had ever been employed while he lived in Houston.

Lorie Ann further explained that appellant did show some enthusiasm in regard to birthday celebrations, and she described him as an "intellectual individual" who she could ask for help with her school work. She noted that he, at her college graduation, had "pulled [her] aside" to ask her whether she thought that "he was a good father." And she opined that appellant felt "extremely guilty about his role as a parent and a father."

In regard to the events of May 29, 2015, Lorie Ann testified that at the time, she was in Houston and staying with her brother, Antonio Foster. At 7:26 a.m., she spoke to the complainant, who "sounded normal," on the complainant's cellular telephone. "There was no argument in the background" and "no loud screaming." After a short time, the telephone call "dropped" or was disconnected. At 7:40 a.m., Lorie Ann received a "FaceTime"[5] call from the complainant's cellular telephone, but the call "did not connect"; "[i]t did not [go] through." She then "tried to call [the complainant] back several times," but did not get an answer. She also sent the

---

[5]     "FaceTime is an application that allows individuals to make video calls from telephones." *Perone v. State*, No. 14-12-00969-CV, 2014 WL 1481318, at *2 (Tex. App.—Houston [14th Dist.] Apr. 15, 2014, no pet.) (mem. op., not designated for publication) (footnote omitted).

8

complainant "several text messages" and called appellant's cellular telephone. At one point, in response to one of Lorie Ann's calls, appellant answered the complainant's cellular telephone and stated that she was "okay." He sounded "very jittery, very nervous." And because Lorie Ann "instinct[ively]" knew that "something [was] wrong," she called for emergency assistance to make "a welfare check" at the complainant's apartment. When Lorie Ann subsequently arrived at the complainant's apartment, she learned that appellant "had tried to kill himself."

Lorie Ann opined that appellant had "thought about" killing the complainant before he actually did so, he "planned what he was going to do," and then he "attempt[ed] to commit suicide" afterwards. And she further opined that he was "extremely self[ish]" because he did not think about how killing the complainant would affect his children.

On cross-examination, Lorie Ann testified that appellant had worked at Sugar Industry Authority of Jamaica for twenty-five years. He had helped her with her school work as a child, was present "in the house," and went to her "track meets" while she was in school. After the complainant's death, appellant "signed a waiver" to ensure that Lorie Ann and Antonio received "the money from [the complainant's] life insurance policy." Lorie Ann conceded that she did not know what had happened between her parents prior to her telephone call with the complainant on

May 29, 2015. And she did not know what had happened between appellant and the complainant after her telephone call with the complainant had "dropped."

Antonio testified that appellant is his father, the complainant was his mother, and Lorie Ann is his sister. In regard to the complainant, he noted that she had a "bachelor's degree in business" and a master's degree from the University of West Indies in Jamaica. She met appellant approximately thirty years ago when he was her math tutor, and they were married for twenty-five or twenty-six years. The complainant was "very helpful" to Antonio, understanding "everything [that he] was going through." She supported Antonio in his school work, and she wanted him and Lorie Ann to attend the best schools in Jamaica. And the complainant was "a strong woman" and was diligent, hardworking, sociable, and well loved.

In regard to appellant, Antonio testified that he excelled in mathematics and "ha[d] a diploma in land surveying" and a "bachelor's degree in business management from the University of West [I]ndies in Jamaica." While Antonio was growing up, appellant was "there," but he was not as supportive as the complainant. However, he would help Antonio with his school work and education, he congratulated Antonio when he did well, and he supported Antonio in sports.

Appellant worked as "a quality inspector" at the Sugar Industry Authority of Jamaica "[f]or as long as [Antonio] c[ould] remember." He "made money," and when the complainant would "ask him for money," "he would put some up." But

Antonio did not "believe [that] he put [up] as much as he could." When the family needed to move to another community in Jamaica for Antonio and Lorie Ann to be "closer to . . . school," appellant did not financially support the move. But, when the family moved to the United States from Jamaica, he was "okay with it." For a period of time, appellant went "back and forth from Jamaica to Houston" in order to "sort out family assets and finances in Jamaica" before he moved to Houston permanently. And he and the complainant seldom argued.

On cross-examination, Antonio testified that while he was growing up, appellant provided for the family "[t]o the extent [that] he could" and he "did as much as he could." He helped Antonio with his school work and attended his sporting events. When the family moved to a different community in Jamaica so that Antonio and Lorie Ann could be closer to school, appellant "c[a]me around" to the idea because he saw that it was good for his children. He also "help[ed] [the complainant] figure out [how] to finish paying off the[ir] [new] house" following the move. And appellant maintained the same job for twenty-five or thirty years.

Appellant also, at one point in time, helped Antonio move from Connecticut to Houston. He visited Lorie Ann while she attended college in Denton, Texas. And during the time that appellant went "back and forth" between Jamaica and Houston, he would come to see the complainant. Antonio further noted that appellant had only remained in Jamaica after the family had moved to the United States so that he

could continue working. When he moved to Houston, he had a "hard time adjusting" and he "[p]retty much" gave up everything in his life in order to move. But, appellant did have a pension from which he was paid an annuity, and upon moving to Houston, he worked at a medical clinic, although he was eventually "laid off." And Antonio testified that appellant did sign a waiver to allow Lorie Ann and himself to receive the money from the complainant's life insurance policy.

Appellant testified that he was from Jamaica and had lived there his entire life until 2014. He met the complainant in 1983 at a Christmas party, they married in 1990, and they had two children, Lorie Ann and Antonio. Appellant worked for the Sugar Industry Authority of Jamaica as a factory inspector and "gradually moved up in th[e] company." From January to July, he would work seven days a week because it was "crop time," and during the remaining portion of the year, he would work five days a week. Appellant earned money and "provided for" his family, which he described as a "normal, loving family."

In regard to his children, appellant testified that he had helped Lorie Ann and Antonio with their "studies" and he "always wanted them to do well in school and come out with a good education." Appellant attended his children's sporting events, he always gave Lorie Ann and Antonio their monthly allowance, and he attended Lorie Ann's graduation from college. He loved Lorie Ann and Antonio "very much" and is proud of them.

Appellant further explained that in 2010, he and the complainant decided to move their family to the United States so that their children could have "a better life." However, for a period of time, he stayed in Jamaica to work so that both he and the complainant were not looking for new employment at the same time.[6] And during this time, appellant would come to visit twice a year, staying for several months at a time.

In 2014, appellant moved to Houston, Texas, retiring from his job at the Sugar Industry Authority of Jamaica after the complainant had encouraged him to do so. He gave up his life and career to move to the United States for his children; however, he "had no problem [with the idea of] moving" to Houston. After moving to Houston, appellant worked as a medical coder and biller until February 2015 when he was "laid off." However, he began looking for new employment, and he continued to maintain his qualification as a "certified . . . coder."

In regard to Dr. Harris, appellant testified that he was the family's doctor. Beginning in 2014, appellant suspected that Dr. Harris and the complainant were having an affair. Moreover, in the "early part of 2015," appellant saw the complainant "hugging" Dr. Harris "for minutes and minutes." The hug was "more than a goodbye hug" because of its "closeness and the length of time that it went on for." And Lorie Ann had informed appellant that the complainant and Dr. Harris

---

[6]     Appellant testified that the complainant did not find a job until 2014.

13

had an agreement that "if [Dr. Harris] . . . die[d], then [she] would take care of his children," and if the complainant died then Dr. Harris he would take care of Lorie Ann and Antonio.

Before May 29, 2015, appellant had discussed with the complainant his concerns about her and Dr. Harris having an affair, which she initially denied. And on the morning of May 29, 2015, before the telephone call from Lorie Ann, appellant and the complainant had another discussion about her purported affair with Dr. Harris. Further, after she ended her telephone call with Lorie Ann, appellant again asked her if she was having an affair with Dr. Harris. The complainant then told him that "[y]es, [she was] having a[] [sexual] affair with him." She explained that "the reason [that] she had fibroids was because [appellant] was not sexing her properly" and Dr. Harris and she engaged in sexual intercourse "to get rid of [her] fibroids." Upon hearing this, appellant "lost [his] mind" and became angry and resentful. He picked up a hand weight and "went berserk." He "just start[ed] flaying away, flaying away wildly." Appellant struck the complainant with the hand weight on her head, and he "must have hit her hard" because she fell to the floor. He then picked up a knife that was close by and stabbed her more than once.

According to appellant, he was in shock, "full of anger," and "not thinking straight" at the time. And he could not clearly remember what exactly had happened. He explained that he had loved the complainant and was "very sorry" for what he

14

had done. She was a good mother, but he had felt betrayed by her affair with Dr. Harris. Appellant admitted to having caused the eighteen stab wounds found on the complainant's body, although he stated that he "did not decide" to kill her. Moreover, he could not recall what had happened to the knife that he had used to stab her.

Appellant further testified that after he had stabbed the complainant, he left the apartment and began driving in his car, "not knowing exactly where [he] was going." He said to himself, "I've hurt [the complainant]. I cannot continue to live with this on me." Eventually, appellant stopped his car because he was "going to kill [him]self." He "went out into the road" and "fell" in front of an "18-wheeler [truck]." Appellant lost consciousness and did not regain it until he later awoke in the hospital.

Appellant explained that he had never told the complainant that he could not live without her, or if she left him, he would kill her. As a result of killing the complainant, he had "lost everything," i.e., his job, his house, and his children. However, he understands why his children "have great anger towards" him.

On rebuttal, Lorie Ann testified that the complainant, a week before her death in May 2015, had told her that she was not happy in her relationship with appellant and she wanted a divorce. The complainant, who appeared "[c]autious," then said

that she had told appellant these things. And he told the complainant that "he could not live without her" and he "would kill her . . . if she tried to leave him."

Lorie Ann also testified that appellant, at her college graduation, in May 2015, had asked her whether she "thought that he was a good father." He also told her that "[h]e felt like he was being excluded from things," Lorie Ann and Antonio preferred speaking to the complainant over him, and the extended family viewed him "in a negative light." At the end of their conversation, appellant "said something about like [y]ou are going to see." And Lorie Ann "felt like he was alluding to . . . the extended family," but she "didn't know what he [had] meant by that."

On cross-examination, Lorie Ann explained that she did not tell anyone about appellant's statements that "he could not live without [the complainant]" or he "would kill her . . . if she tried to leave him" until the first day of trial.

After the jury found him guilty and assessed his punishment at confinement for life, appellant filed a motion for new trial, arguing, among other things, that he did not receive effective assistance of counsel during the punishment phase of trial because his trial counsel did not "investigate and present witnesses at punishment who could have testified . . . about [appellant's] exceptionally stable and professional background, extensive education, peaceful character, [and] good relationship with [the complainant]"; "investigate and present evidence

16

about . . . [appellant's] mental health and his behavior in custody"; and "make proper objections."

Appellant attached to his motion, his sworn declaration,[7] stating that his trial counsel had "never talked to [him] about what witnesses to call" and if counsel had, he would have "told him to call [his] niece [S]hantal Foster, [his] aunt Beverly Brown, [his] brother Desmond Foster, [his] sister Elai[ne] Foster, [his] brother Delroy Foster, Chaplain Edward Perez, and other friends and family." According to appellant, these individuals "would have testified that [he] ha[d] always lived a peaceful, upstanding, professional life"; he had "an extensive education from the University of West Indies and the University of Technology in Kingston"; he "worked for the Sugar Industry Authority [of Jamaica] since 1987 where [he] was promoted for [his] hard work"; and he and the complainant "always had a good relationship." Further, appellant explained that although his trial counsel did contact Delroy and Shantal, counsel "did not try to call them to court."

At the hearing on appellant's new-trial motion, the trial court admitted into evidence the affidavit of appellant's trial counsel, in which he testified that in the course of his representation of appellant, he "reviewed the [S]tate's file to ensure that [he had] received all discovery, including the offense report, [appellant's]

---

[7]    At the hearing on appellant's new-trial motion, the trial court admitted appellant's sworn declaration into evidence.

statement, witness statements, autopsy report, scene photos and video and DNA reports." Further, he "visited the crime scene" and "performed legal research." Counsel met with appellant "on . . . several occasions in court and in the Harris County Jail to discuss what [he] expected the [S]tate to present, the allegations[,] and [appellant's] possible defenses." And he also "spoke with possible witnesses for both guilt[-]innocence and for possible punishment."

Appellant's trial counsel explained that appellant "discuss[ed] [his] case with [counsel] and assist[ed] [counsel] with his defense." He asked counsel "intelligent questions about his case and the law" and "discussed his actions leading to his arrest, the legal process[,] and legal points of law." And counsel opined that appellant was "competent to stand trial."

In regard to the presentation of mitigation evidence at the punishment phase of trial, appellant's trial counsel testified that he had "inquired of [appellant] whether he could provide [counsel] with any friends or relatives that could testify on his behalf." In response, appellant "did not provide any names or information or possible witnesses." He simply stated that because he was from Jamaica, "he did not have anyone that could come or anyone in Texas that he knew that could testify on his behalf."

Appellant's trial counsel further testified that he spoke with appellant's brother, Delroy, "on many occasions as well as [appellant's] niece[,] [S]hantal."

Although counsel "asked both [of them] if they or anyone else could testify for [appellant]," "[t]hey were not able to testify or provide names" of any other potential witnesses.

Appellant's trial counsel had also spoken with appellant's son, Antonio, and "attempted to contact [appellant's] daughter," Lorie Ann. Antonio "came to [counsel's] office and [counsel] spoke with him on a number of occasions on the phone." "From these conversations [with Antonio] and conversations with [appellant], [trial counsel] formulated the strategy to present evidence of mitigation through [the testimony of] Antonio" and Lorie Ann. Through counsel's questioning of Antonio and Lorie Ann, during the punishment phase of trial, "evidence was presented to the jury, that [appellant] was an integral part of his family's life, . . . he [had] graduated from college, . . . he [had] met his wife in college, . . . he [had] attended his children's extracurricular activities, . . . he [had] tutored [his] children, . . . he was a hard and reliable worker, . . . he [had] provided for his family[,] and . . . he was a part of his children's li[ves] until he was incarcerated."

The trial court also admitted into evidence the affidavit of Beverly Brown, in which she testified that appellant is her nephew and they "ha[d] known each other all of [their] lives." When she heard about what had happened to the complainant, she "found it unbelievable because [appellant was] always such a nice and calm person" and "[h]e [would] never lose[] his temper and w[ould] not even shout or

19

raise his voice." Beverly opined that appellant loved the complainant and his children, "worked hard his whole life to provide for them," and "made countless sacrifices including leaving behind his country of Jamaica and everything [that] he kn[ew] to move to the United States." Although "[m]oving to America was extremely difficult for [him]," "he did it for [the complainant] and [his] children." He was "always a loving dad and a good provider," he "would never have intentionally hurt his family," and the killing of the complainant "could not have been planned because [appellant had] devoted his whole life to building his family."

According to Beverly, appellant's trial counsel did not contact her to testify or to "provide a written deposition on his behalf at his trial." And she was not "informed that [she] would have been reimbursed for travel to testify at [appellant's] trial," which "she would have been more than happy to do if asked."

The trial court also admitted into evidence the affidavit of Elaine, in which she testified that she is appellant's sister and was "in charge of him growing up." She "would take him to school" and "help care for him." They had a "close family," their parents were married, and their family members were "all educated and productive members of society."

Elaine explained that appellant "ha[d] always been calm and stable." After high school, "he did a one-year internship at the regional hospital before attending the University of West Indies where he met" the complainant. Appellant had "a

20

successful, permanent career with Jamaica's Sugar Industry Authority," owned a "family home in a gated community," and "sent his children to good private schools." He was "a very generous man," and one time, when he had "sold a house, a large portion of the proceeds were given to another member of the family who needed funds to open a restaurant." Appellant "always provided financially for his family and shared in the work for the household." He was "in charge of going to the supermarket and working with the kids on their schoolwork." When appellant was away from his family, he "would spend a lot of time on the phone with his family," and he would "sit and help [Lorie Ann] with her homework over the phone."

Moreover, appellant had "always t[aken] his family out on trips sometimes overseas." He "took them to cricket matches, school functions[,] and Disney World." Appellant was "always trying to bond and . . . was very gentle and polite." And Elaine had never "heard him raise his voice to his family." She opined that appellant, the complainant, and their children were "so close." On one occasion when appellant's family came to visit her, the family did not want to stay in separate rooms "so they all piled into one bed and the bed collapsed."

According to Elaine, she was never contacted by appellant's trial counsel. She "would have been more than willing to provide testimony by a deposition and [she] would have made every effort to come to the United States for the trial." She and appellant's brother, Delroy, "came to America to see [appellant] and attend [the

21

complainant's] funeral." And they "waited for hours in the jail before being turned away."

In his affidavit, admitted into evidence by the trial court, Ludlow Brown testified that appellant was his colleague and friend for more than twenty-seven years. "As the Development and Training Officer for the Sugar Industry Authority of Jamaica, [he had] supervised [appellant] and . . . chosen him from among many candidates to be promoted to [his] position when [he] retired." Appellant received the promotion due to "his knowledge and expertise" and because "he always kept his cool and had a warm and friendly nature."

Ludlow explained that as part of his job, appellant participated in "critique sessions with management" during which "people had to criticize each other, sometimes harshly." Appellant "stood out because he never lost his cool" and "always remained calm." And he had the "right" personality for the job.

Ludlow was "totally shock[ed]" when he "learn[ed] what [had] happened to [the complainant] because it was so out of character for [appellant]." "In twenty[-]seven years of knowing and working closely with [appellant], [Ludlow] ha[d] never seen [him] lose his temper or act aggressively." Appellant was "always well[-]liked and respected by . . . colleagues."

Ludlow noted that he had written "a character reference letter on [appellant's] behalf," the letter was dated June 11, 2015, and appellant's brother, Delroy,

"provided it to [appellant's] lawyer." However, Ludlow "never heard from [a] lawyer even though [the letter] had all of [his] contact information." And, "[i]f [he] had been asked to come testify or to provide a deposition, [he] would have been more than willing."

In her affidavit, admitted into evidence by the trial court, Roxanne Shantal Foster ("Shantal") testified that she is appellant's niece. She was "completely shocked when [she] heard what [had] happened because [appellant was] not the type of person to do anything wrong like th[at]." "[H]e is a very nice and kind person." And "[w]henever [they] had family visits, everyone was excited to jump in his car because they knew [that appellant] would be the one to take [them] fun places." Appellant took her "to the beach or to have ice cream." "Family was very important to [appellant] and he was always there for [his family]." When Shantal moved to the United States, appellant was her "main support system." "He was the person [that she] would call for help with any family or financial issue[,] and [appellant had] never failed to make sure [that she] got whatever assistance [that she] needed." Moreover, Shantal knew that she "could count on him."

When Shantal found out what had happened to the complainant, she "research[ed] attorneys online and contacted [appellant's trial counsel]." She then "turned him over to . . . [appellant's brother,] Delroy[,] . . . to be retained." Although Shantal spoke on the telephone with appellant's trial counsel two times,

23

he "never asked [her] any questions about [appellant] or his background or said anything about testifying or coming to trial." Shantal "would have traveled to Houston to testify." And "[i]f [she] had known that [she] could have provided a deposition or been reimbursed for travel to testify at [appellant's] trial, [she] also would have gladly done so."

The trial court also admitted into evidence, appellant's education records from Houston Community College, showing the courses that he had taken at the Harris County Jail; "classification records" from the Harris County Jail; appellant's medical records from the Harris County Jail; an affidavit from an employee with the HCSO, stating that there were no "Jail Disciplinary Records" for appellant; and the June 11, 2015 "Character Reference" letter from Ludlow.[8]

After admitting evidence and hearing argument, the trial court denied appellant's new-trial motion, stating:

> [T]he Court having carefully considered the arguments of counsel and all the affidavits, I have to say you guys have done an excellent job. However, I was there and present during the trial. I thought [appellant's trial counsel] did an excellent job and seemed very well-prepared. I have given his affidavit high credibility in regards to the witnesses, that he was not given the names of witnesses, and the ones that he did speak with were not able to testify.

---

[8] The trial court also admitted into evidence several exhibits for the State.

24

## Ineffective Assistance

In his second issue, appellant argues that his trial counsel did not provide him with effective assistance during the punishment phase of trial because he did not investigate and present mitigating evidence or object to certain hearsay testimony of Lorie Ann.

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see* U.S. CONST. amend. VI. To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

Appellant has the burden to establish both prongs of *Strickland* by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. We apply the same two-prong *Strickland* standard of review to claims of ineffective assistance of counsel during both the guilt and punishment phases of trial. *Hernandez v. State*, 988 S.W.2d 770, 772–74 (Tex. Crim. App. 1999).

Appellant presented his ineffective-assistance claim to the trial court in a motion for new trial and received a hearing on his motion. We, therefore, analyze his issue under an abuse of discretion standard as a challenge to the denial of his new-trial motion. *Biagas v. State*, 177 S.W.3d 161, 170 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Biagas*, 177 S.W.3d at 170. If there are two permissible views of the evidence, the trial court's choice between them cannot be held to be clearly erroneous. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). A

trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 112.

We note that a trial court is in the best position to "evaluate the credibility" of witnesses and resolve conflicts in evidence. *See Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). And a trial court may choose to believe or disbelieve all or any part of a witnesses' testimony. *See id.* at 234. We "impute implicit factual findings that support the trial judge's ultimate ruling on th[e] [new-trial] motion when such implicit factual findings are both reasonable and supported in the record." *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005) (internal quotations omitted); *see also Escobar v. State*, 227 S.W.3d 123, 127 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

### *Mitigating Evidence*

Appellant first asserts that his trial counsel did not properly investigate and present mitigating evidence and his strategy of "relying on [his] cross-examination of [the] [S]tate's witnesses" for mitigation evidence was "[i]rrational."

In order to prevail on his ineffective-assistance-of-counsel claim, appellant must first show that his trial counsel's performance fell below an objective standard of reasonableness when considering prevailing professional norms. *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim.

App. 2002). There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and the challenged action could be considered to have been prompted by sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). That another attorney, including appellant's counsel on appeal, might have pursued a different course of action does not necessarily indicate ineffective assistance. *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983); *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.—Texarkana 2005, pet. ref'd).

In considering whether trial counsel conducted an adequate investigation for potential mitigating evidence and failed to present mitigating evidence, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence was reasonable. *Wiggins v. Smith*, 539 U.S. 510, 522–23, 123 S. Ct. 2527, 2536 (2003); *Goody v. State*, 433 S.W.3d 74, 80 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). "While '*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence,' 'counsel can . . . make a reasonable decision to forego presentation of mitigating evidence [only] after evaluating available testimony and determining that it would not be helpful.'" *Goody*, 433 S.W.3d at 80–81 (alterations in original) (quoting *Wiggins*, 539 U.S. at 533, 123 S. Ct. at 2541; *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.]

2000, pet. ref'd)). An attorney's decision not to investigate or to limit the scope of the investigation is given a "heavy measure of deference" and assessed in light of all circumstances to determine whether reasonable professional judgment would support the decision. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. However, a failure to uncover and present mitigating evidence cannot be justified if counsel has not conducted a thorough investigation of the defendant's background. *Shanklin v. State*, 190 S.W.3d 154, 164 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd, improvidently granted*, 211 S.W.3d 315 (Tex. Crim. App. 2007); *see also Gonzalez v. State*, No. 01-12-01115-CR, 2014 WL 7205145, at \*4 (Tex. App.—Houston [1st Dist.] Dec. 18, 2014, pet. ref'd) (mem. op., not designated for publication).

Here, the evidence presented to the trial court at the new-trial hearing shows that appellant's trial counsel, in the course of his representation of appellant, "reviewed the [S]tate's file to ensure that [he had] received all discovery, including the offense report, [appellant's] statement, witness statements, autopsy report, scene photos and video and DNA reports." Further, he "visited the crime scene" and "performed legal research." Counsel met with appellant "on . . . several occasions in court and in the Harris County Jail to discuss what [he] expected the [S]tate to present, the allegations[,] and [appellant's] possible defenses." And counsel "spoke with possible witnesses for both guilt[-]innocence and for possible punishment."

In regard to the presentation of mitigation evidence specifically, appellant's trial counsel "inquired of [appellant] whether he could provide [counsel] with any friends or relatives that could testify on his behalf." However, appellant, in response, "did not provide any names or information or possible witnesses." He simply stated that because he was from Jamaica, "he did not have anyone that could come or anyone in Texas that he knew that could testify on his behalf." *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

Notably, appellant's trial counsel did speak to appellant's brother, Delroy, "on many occasions as well as [appellant's] niece[,] [S]hantal." Although counsel "asked both [of them] if they or anyone else could testify for [appellant]," "[t]hey were [not] able to testify or provide names" of any other potential witnesses to testify on appellant's behalf.

Appellant's trial counsel also spoke with appellant's son, Antonio, and "attempted to contact [appellant's] daughter," Lorie Ann. Antonio actually "came to [counsel's] office and [counsel] spoke with him on a number of occasions on the phone." "From [his] conversations [with Antonio] and conversations with [appellant], [trial counsel] formulated the strategy to present evidence of mitigation

through [the testimony of] Antonio and" Lorie Ann. Through his questioning of Antonio and Lorie Ann during the punishment phase of trial, trial counsel presented evidence to the jury "that [appellant] was an integral part of his family's life, . . . he [had] graduated from college, . . . he [had] met his wife in college, . . . he [had] attended his children's extracurricular activities, . . . he [had] tutored [his] children, . . . he was a hard and reliable worker, . . . he [had] provided for his family[,] and . . . he was a part of his children's li[ves] until he was incarcerated."

The decision of whether to present certain witnesses at trial is largely a matter of trial strategy. *Shanklin*, 190 S.W.3d at 164; *Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd) (holding it is trial counsel's prerogative, as a matter of trial strategy, to decide which witnesses to call). And "[t]he decision not to call witnesses at the punishment phase is a tactical maneuver and may, in certain instances, be a wise procedural move." *See Briones v. State*, No. 01-14-00121-CR, 2016 WL 2944274, at *13 (Tex. App.—Houston [1st Dist.] May 19, 2016, no pet.) (mem. op., not designated for publication) (internal quotations omitted); *see also Moore v. State*, 700 S.W.2d 193, 206 (Tex. Crim. App. 1985) (decision not to call witnesses at punishment stage of capital murder trial not ineffective assistance of counsel).

Appellant's trial counsel investigated potential witnesses and potential mitigation evidence to be used during the punishment phase of trial, and based on

31

his investigation, counsel determined that the best trial strategy would be to elicit mitigation evidence through the testimony of appellant's two children. *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."); *cf. Milburn*, 15 S.W.3d at 270 ("[Defendant's] trial counsel performed no investigation [of] any possible mitigating factors and failed to contact even a single family member or friend, despite the availability of such mitigation evidence."). Trial counsel also presented mitigation evidence through his direct examination of appellant, and he then explained the mitigation evidence during his closing argument to the jury. *See, e.g.*, *Garza v. State*, No. 05-93-00458-CR, 1996 WL 29308, at *4 (Tex. App.—Dallas Jan. 23, 1999, no pet.) (not designated for publication) (trial counsel utilized direct examination of defendant as means to mitigate and encourage assessment of lighter sentence); *see also Ford v. State*, No. 01-09-00981-CR, 2011 WL 4925975, at *3 (Tex. App.—Houston [1st Dist.] Oct. 13, 2011, no pet.) (mem. op., not designated for publication) (defendant did not establish trial counsel's performance fell below objective standard of reasonableness where counsel "attempt[ed] to present mitigation evidence in cross-examination" and then emphasized mitigation evidence during closing argument); *Enriquez v.*

32

*State*, Nos. 05-95-00690-CR, 05-95-00744-CR, 1997 WL 196358, at \*3–4 (Tex. App.—Dallas Apr. 23, 1997, no pet.) (not designated for publication) (trial counsel's performance not deficient where counsel elicited mitigation evidence in his cross-examination of State's witnesses and his direct examination of defendant and "forcefully argued th[e] mitigating evidence" to trier of fact).

We note that appellant's new-trial evidence consisted of his sworn declaration, stating that his trial counsel "never talked to [him] about what witnesses to call," and the affidavits of several friends and family members, stating that they may have been willing to testify on his behalf on matters related to his education, professional career, positive attributes, and the closeness of his familial relationships.[9] However, a trial court is under no obligation to accept as true testimony, even if unrebutted, offered at a hearing on a motion for new trial. *See Gaston v. State*, 136 S.W.3d 315, 322 (Tex. App.—Houston [1st Dist.] 2004, pet. struck); *Messer v. State*, 757 S.W.2d 820, 828 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd).

---

[9]    At the new-trial hearing, appellant presented other mitigation evidence that described him as a non-violent, kind, educated, and hard-working individual. This evidence included his Harris County Jail records, showing a lack of disciplinary records, his education records from Houston Community College, showing a continued interest in education, and a "Character Reference" letter from his colleague, Ludlow, describing him as a polite, well-mannered, warm, knowledgeable, and good-natured individual.

Further, to the extent that appellant asserts that it was "[i]rrational" for his trial counsel to present mitigation evidence through the testimony of his children, Lorie Ann and Antonio, the mere fact that another attorney may have employed a different strategy, does not render trial counsel's assistance ineffective. *Matthews v. State*, 830 S.W.2d 342, 347 (Tex. App.—Houston [14th Dist.] 1992, no pet.); *see also Hawkins*, 660 S.W.2d at 75. And the presentation of mitigation evidence through the cross-examination of the State's witnesses may constitute a valid tactical decision, depending on the circumstances of a given case. *See, e.g.*, *Toledo v. State*, 519 S.W.3d 273, 288 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (trial counsel presented mitigation evidence by cross-examining State's witness); *Ford*, 2011 WL 4925975, at *3 (defendant did not establish trial counsel's performance fell below objective standard of reasonableness where counsel "attempt[ed] to present mitigation evidence in cross-examination"); *Whitaker v. State*, No. 09-09-00246-CR, 2010 WL 2541863, at *3 (Tex. App.—Beaumont June 23, 2010, no pet.) (mem. op., not designated for publication) (trial counsel, through cross-examination, attempted to present mitigation evidence); *Enriquez*, 1997 WL 196358, at *3–4 (trial counsel's performance not deficient where he elicited mitigation evidence through his cross-examination of State's witnesses).

During trial counsel's cross-examinations of Lorie Ann and Antonio, the jury heard evidence that appellant was present in the home while his children were

growing up. He helped them with their school work and attended their extracurricular activities, including their sporting events. Appellant maintained the same job for twenty-five or thirty years, provided for his family, and "did as much as he could." He made sacrifices in his life for the good of his children, and although he remained in Jamaica for a time after his family moved to the United States, he did so only to continue working.

Moreover, when appellant moved to Houston, he "[p]retty much" gave up everything in his life. And even though he was eventually "laid off," which is why he was not working at the time of the complainant's death, he initially worked at a medical clinic after moving to Houston. Additionally, following the complainant's death, appellant signed a waiver to ensure that Lorie Ann and Antonio received the money from her life insurance policy. And much of the mitigation evidence elicited by appellant's trial counsel during cross-examination paralleled and supported appellant's own testimony on direct examination.

Further, to the extent that appellant relies on *Frangias v. State* in support of his argument that because his trial counsel "fail[ed] to pursue deposition testimony of . . . potential defense witness[es]," his performance was deficient, appellant's reliance is misplaced. 450 S.W.3d 125, 127, 137–41 (Tex. Crim. App. 2013) (trial counsel's failure to secure deposition testimony of "a critical witness [for the defense] at the guilt phase of trial" constituted deficient performance; witness was

"the only witness who could directly corroborate the [defendant's] account"; and testimony would have been exculpatory). And to the extent that appellant argues in his brief that his trial counsel's representation was deficient because he did not "present [additional] evidence" apart from appellant's own testimony on direct examination "that after he was laid off from his medical coding job[,] he took continuing education classes to maintain and improve his coding credential[s] while looking for a new job," we note that he provides no support for his assertion that mitigation evidence beyond that elicited by counsel through his direct examination of appellant was required. *See* TEX. R. APP. P. 38.1(i); *see also Enriquez*, 1997 WL 196358, at *3–4; *Garza*, 1996 WL 29308, at *4.

Here, we are not faced with a situation where appellant's trial counsel failed to uncover and present mitigating evidence because he did not conduct a thorough investigation of appellant's background. *Cf. Shanklin*, 190 S.W.3d at 164–65; *Milburn*, 15 S.W.3d at 270 ("[Defendant's] trial counsel performed no investigation of any possible mitigating factors and failed to contact even a single family member or friend, despite the availability of such mitigation evidence."). Thus, based on the foregoing, we cannot conclude that the performance of appellant's trial counsel fell below an objective standard of reasonableness. Accordingly, we hold that appellant has not shown that his trial counsel's performance was deficient on the ground that counsel did not investigate and present mitigating evidence or because his decision

36

to "rely[] on [his] cross-examination of" Lorie Ann and Antonio to present mitigating evidence was "[i]rrational."[10]

We overrule this portion of appellant's second issue.

*Hearsay Objection*

Appellant next asserts that his trial counsel did not properly raise a hearsay objection to Lorie Ann's rebuttal testimony that the complainant "had told her [that] appellant had threatened to kill her if she left him." *See* TEX. R. EVID. 801(d), 802.

In his new-trial motion, appellant included a single sentence in which he asserted that his trial counsel did not "make proper objections." However, appellant did not, in either his new-trial motion or at the hearing on his motion, assert that his trial counsel did not provide him with effective assistance of counsel because he did not object to Lorie Ann's rebuttal testimony on the basis of hearsay. Thus, appellant

---

[10] Because appellant has not shown that his trial counsel's performance was deficient, we need not determine whether appellant was prejudiced by his trial counsel's actions. *See Williams v. State*, 301 S.W.3d 657, 687 (Tex. Crim. App. 2009); *see also Strickland v. Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 2069 (1984); *Mallett v. State*, 65 S.W.3d 59, 68 (Tex. Crim. App. 2001). We note that appellant, in passing in his brief, argues that his trial counsel did not render effective assistance during the punishment phase of trial because counsel did not "examine records" of appellant's "mental and physical health problems," which would have shown "his human suffering after having killed his wife." However, appellant does not assert that he was prejudiced by his counsel's purported failure. *See* TEX. R. APP. P. 38.1(i); *McCarthy v. State*, 65 S.W.3d 47, 49 n.2 (Tex. Crim. App. 2001) (inadequately briefed issue may be waived on appeal); *see also Bessey v. State*, 199 S.W.3d 546, 555–56 (Tex. App.—Texarkana 2006) (overruling ineffective-assistance claim as inadequately briefed because defendant made no effort to demonstrate how his counsel's alleged deficiencies prejudiced his defense), *aff'd*, 239 S.W.3d 809 (Tex. Crim. App. 2007).

has raised his complaint about his trial counsel's failure to raise a hearsay objection for the first time on appeal.

Generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. However, the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*

As previously noted, in order to prevail on his ineffective-assistance-of-counsel claim, appellant must first show that his trial counsel's performance fell below an objective standard of reasonableness when considering prevailing professional norms. *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Bone*, 77 S.W.3d at 833. And there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and the challenged action could be considered to have been prompted by sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Ex parte White*, 160 S.W.3d at 51; *Tong*, 25 S.W.3d at 712.

Here, the record is silent as to why appellant's trial counsel did not make a hearsay objection to Lorie Ann's rebuttal testimony that the complainant "had told her [that] appellant had threatened to kill her if she left him." *See Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." (internal quotations omitted)); *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003) ("[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."); *Bone*, 77 S.W.3d at 835 ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record." (internal quotations omitted)). Absent contrary evidence, we will not second-guess the strategy of appellant's counsel at trial through hindsight. *Garcia*, 57 S.W.3d at 440 ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined." (internal quotations omitted)); *Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979) ("This Court will not second-guess through hindsight the strategy of counsel at trial nor will the fact that another attorney might have pursued a different course support a finding of ineffectiveness.").

Thus, we presume that counsel was acting pursuant to a sound trial strategy. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (where record

silent as to why trial counsel did not object to hearsay, defendant failed to rebut presumption counsel's decision reasonable); *Crocker v. State*, 441 S.W.3d 306, 315 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("Because the record is silent concerning counsel's reasons for not objecting, we must presume counsel had a valid strategy."); *Williams v. State*, 309 S.W.3d 124, 132 (Tex. App.—Texarkana 2010, pet. ref'd) ("Here, since the record is silent as to why trial counsel failed to object to this testimony, we will assume it was due to any strategic motivation that can be imagined.").

Accordingly, in the absence of a record reflecting why appellant's trial counsel did not make a hearsay objection to Lorie Ann's rebuttal testimony that the complainant "had told her [that] appellant had threatened to kill her if she left him," we hold that appellant has failed to rebut the presumption that trial counsel's decision was reasonable. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (appellate court may not conclude, based on speculation, counsel ineffective when record silent about why he made decisions at trial); *see also Miles v. State*, No. 01-11-00401-CR, 2012 WL 2357449, at *4 (Tex. App.—Houston [1st Dist.] June 21, 2012, no pet.) (mem. op., not designated for publication) ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance."); *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (unable to conclude trial counsel's

performance deficient where record silent as to counsel's reasons for not objecting to inadmissible hearsay).  We further hold that the professional error, if any, was not so outrageous that no competent attorney would have engaged in it.  *See Menefield*, 363 S.W.3d at 593; *see also Miles*, 2012 WL 2357449, at *4.

We overrule this portion of appellant's second issue.

### Jury Charge Error

In his first issue, appellant argues that the trial court erred in not sua sponte instructing the jury during the punishment phase of trial on the proper burden of proof for an extraneous offense or bad act because the State introduced evidence, through the rebuttal testimony of Lorie Ann, that he had "made [a] threat to kill" the complainant, such testimony constituted evidence of an extraneous offense or bad act, and he was egregiously harmed by the omission of the reasonable-doubt instruction.  *See* TEX. CODE CRIM. PROC. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2018).  In response, the State asserts that Lorie Ann's testimony about appellant's "threat" did not constitute evidence of an extraneous offense or bad act.

In regard to the admissibility of evidence of extraneous offenses and bad acts in non-capital cases during the punishment phase of trial:

> [E]vidence may be offered by the [S]tate and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, *any other evidence of an extraneous*

*crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.*

*Id.* (emphasis added); *see also Huizar v. State*, 12 S.W.3d 479, 483–84 (Tex. Crim. App. 2000) (article 37.07, section 3(a)(1) governs admissibility of evidence at punishment phase in all non-capital cases). While extraneous-offense and bad-act evidence is generally admissible under article 37.07, section 3(a)(1), the jury may not consider such evidence in assessing punishment unless it first concludes beyond a reasonable doubt that the defendant committed the offenses or acts. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *see also Huizar*, 12 S.W.3d at 484; *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999); *Burks v. State*, 227 S.W.3d 138, 149–50 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). When a jury determines beyond a reasonable doubt that the defendant committed the extraneous offense or bad act, it may then use the evidence however it chooses in assessing punishment. *Huizar*, 12 S.W.3d at 484; *Fields*, 1 S.W.3d at 688; *Burks*, 227 S.W.3d at 150.

When evidence of an extraneous offense or bad act is admitted during the punishment phase of a trial, the trial court must instruct the jury that the evidence may only be considered if the State proves the commission of the extraneous offense or bad act beyond a reasonable doubt. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007) (trial court shall instruct jury on law applicable to case); *Huizar*, 12 S.W.3d at 483–84 (article 37.07, section 3(a)(1) constitutes law applicable to

42

non-capital punishment cases and trial courts must sua sponte instruct juries on reasonable-doubt standard); *Burks*, 227 S.W.3d at 150.

Here, Lorie Ann, on rebuttal, testified that the complainant, a week before her death in May 2015, told her that she was not happy with her relationship with appellant and she wanted a divorce. The complainant also stated that, after she had told appellant these things, he told her that "he could not live without her" and he "would kill her . . . if she tried to leave him."

Statements made by a defendant about anticipated acts constitute mere inchoate thoughts and do not constitute evidence of an extraneous offense or bad act that would require the trial court to instruct the jury pursuant to article 37.07, section 3(a)(1). *See Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (defendant's statements about "his desire to kidnap and kill [a certain individual] did not establish prior misconduct"); *see also Massey v. State*, 933 S.W.2d 141, 153–54 (Tex. Crim. App. 1996) (defendant's statement "[t]hat he'd like to kill them" "pertained to [his] thoughts" and did not constitute extraneous offense or bad act); *Phillips v. State*, No. 10-15-00077-CR, 2016 WL 4399975, at *4 n.4 (Tex. App.—Waco Aug. 17, 2016, pet. ref'd) (mem. op., not designated for publication) (defendant's "expression of his desire to have [two people] . . . killed" constituted inchoate thoughts); *Burks v. State*, 227 S.W.3d 138, 149 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (defendant's statements about planned future crimes, wrongs,

or acts constitute mere inchoate thoughts not extraneous offense or bad act); *Burris v. State*, Nos. 01-95-00061-CR to 01-95-00063-CR, 1995 WL 783035, at *1 n.2 (Tex. App.—Houston [1st Dist.] Jan. 11, 1996, pet. ref'd) (not designated for publication) ("Mere thoughts of committing a bad act in the future do not constitute an extraneous act . . . . They are mere inchoate thoughts."). Accordingly, we hold that the trial court did not err in not sua sponte instructing the jury during the punishment phase of trial on the burden of proof for an extraneous offense or bad act. *See* TEX. CODE CRIM. PROC. Ann. art. 37.07, § 3(a)(1).

We overrule appellant's first issue.

## Admission of Evidence

In his third issue, appellant argues that the trial court erred in admitting Lorie Ann's rebuttal testimony that the complainant "had told her [that] appellant had threatened to kill her if she left him" because such testimony constituted evidence of an extraneous offense or bad act, the State did not provide notice of its intent to introduce this evidence of an extraneous offense or bad act, and he did not "'open[] the door' to the evidence."[11] *See id.* art. 37.07, § 3(a)(1), (g).

We review a trial court's decision to admit evidence for an abuse of discretion. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). A trial court

---

[11] We note that appellant has not argued on appeal that the trial court erred in admitting Lorie Ann's rebuttal testimony because it constituted hearsay. *See* TEX. R. EVID. 801(d), 802.

abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

As noted above, during the punishment phase of trial, evidence as to any matter deemed relevant to sentencing may be admitted, including evidence of an extraneous offense or bad act shown beyond a reasonable doubt to have been committed by the defendant. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1); *see also Rodriguez v. State*, 546 S.W.3d 843, 862 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Article 37.07, however, includes a notice provision, stating: "On timely request of the defendant, notice of intent to introduce evidence under [article 37.07] shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g). Rule 404(b) requires the State to "provide reasonable notice before trial that [it] intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief." TEX. R. EVID. 404(b); *see Worthy v. State*, 312 S.W.3d 34, 37 (Tex. Crim. App.

45

2010). This notice requirement prevents surprise. *Hayden v. State*, 66 S.W.3d 269, 272 (Tex. Crim. App. 2001); *Gonzalez v. State*, 337 S.W.3d 473, 485 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

Here, Lorie Ann, on rebuttal,[12] testified that the complainant, a week before her death in May 2015, stated that she had told appellant that she was not happy and wanted a divorce. And, in response, appellant told the complainant that "he could not live without her" and he "would kill her . . . if she tried to leave him." As previously noted, statements made by a defendant about an anticipated act constitute inchoate thoughts and do not constitute evidence of an extraneous offense or bad act. *See Moreno*, 858 S.W.2d at 463; *see also Massey*, 933 S.W.2d at 153–54; *Phillips*, 2016 WL 4399975, at *4 n.4; *Burks*, 227 S.W.3d at 149; *Burris*, 1995 WL 783035, at *1 n.2. And because Lorie Ann's testimony about appellant's threatening statements did not constitute extraneous-offense or bad-act evidence, notice pursuant to article 37.07, section 3(g) was not required. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1), (g).

---

[12] Due to our disposition of appellant's complaint about the admission of Lorie Ann's rebuttal testimony, we need not address the State's other argument that it was not required, pursuant to Texas Code of Criminal Procedure article 37.07, section 3(g), to give notice of the extraneous offense or bad act because it was introduced in rebuttal. *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002); *Gipson v. State*, 619 S.W.2d 169, 170–71 (Tex. Crim. App. 1981); *see also* TEX. R. APP. P. 47.1.

Accordingly, we hold that the trial court did not err in admitting Lorie Ann's rebuttal testimony that the complainant "had told her [that] appellant had threatened to kill her if she left him" on the ground that the State did not provide proper notice of its intent to introduce this evidence.[13] *See id.*

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Bland.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[13] Having concluded that Lorie Ann's testimony about appellant's threatening statements did not constitute extraneous-offense or bad-act evidence, we need not consider appellant's assertion that he did not "open[] the door" for the admission of the purported extraneous-offense or bad-act evidence. (Internal quotations omitted.) *See* TEX. R. APP. P. 47.1. We further note that appellant, in his briefing on his admission-of-evidence complaint, does not assert that he was harmed by the admission of Lorie Ann's rebuttal testimony. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding issue inadequately briefed where defendant "di[d] not address the question of whether the alleged error . . . was harmless"); *Sierra v. State*, 157 S.W.3d 52, 64 (Tex. App.—Fort Worth 2004) (holding issue of whether trial court erred in admitting testimony inadequately briefed where "appellant failed to show how he was harmed by the testimony"), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007); *see also Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011) (point of error inadequately briefed "presents nothing for review").